OPINION OF THE COURT
Jones, J.
We hold as a matter of law that in the circumstances disclosed in this record defendant was illegally detained and accordingly that the shotgun seized in consequence of that detention should have been suppressed as well as statements subsequently obtained from him in direct exploitation of the seizure of the shotgun.
About 4:00 a.m. on October 29, 1981, State Troopers Joseph Micilcavage and William Phillips were on a routine patrol during which they stopped to check a vehicle which was parked with its lights out in a parking area at the end of a dead-end road. The troopers regularly checked this area because it had been the scene of a number of criminal offenses, including drug use, assault, disorderly conduct and vandalism. After checking the parked vehicle Trooper Micilcavage had returned to their then unlighted troop car and Trooper Phillips was talking to the person behind the wheel of the parked car when defendant drove an automobile into the parking area at a fairly high rate of speed; As he approached the troopers’ car, defendant turned his lights off and then back on when he was within 50 or 60 feet of the troopers. He then stopped abruptly and began to back up. Trooper Micilcavage yelled to Trooper Phillips who had apparently already seen the car and who was running toward it. Trooper Phillips yelled toward the car, and defendant either put the car in park or put on the emergency brake, jumped out of the car leaving the door open and approached the troopers.
Trooper Phillips asked defendant what he was doing and requested that he produce his license and registration. Defendant said that he was looking for a friend. When Phillips advised defendant that the parking lot was closed *151 and nobody was there, defendant said he had driven there to urinate. In the interim, Trooper Micilcavage had checked the vehicle to see if there was anyone else in it. Defendant produced his driver’s license but could not provide a registration for the car, explaining that the car belonged to a friend, Ricky Spencer, and that he, defendant, was in the area to return it to him. At Trooper Phillips’ direction, defendant went over to the car to look in the glove compartment for the registration. Defendant tried to shut the door but Phillips prevented him from doing so, shining his flashlight inside to watch as defendant searched through the glove compartment for the registration. Trooper Micilcavage then went back to run a registration check on the vehicle inasmuch as defendant could not produce a registration.
Trooper Phillips continued to question defendant as to where he lived and what he was doing in the parking area. According to Phillips, defendant appeared nervous during the questioning and gave inconsistent or suspicious answers, but the trooper admitted that he had pursued questions in an effort to fluster him. Phillips had observed personal household items in the car and defendant explained that he was moving to his girlfriend’s house.
Trooper Phillips let defendant go to an area to urinate and kept an eye on him in case he tried to drop anything. The trooper then had defendant stand by the car and not move while he went over and looked to see if defendant had dropped anything, but nothing was found. Phillips had defendant empty out his pockets on the front of the car because he thought defendant was acting suspicious. Trooper Phillips also conducted a pat-down frisk of defendant. No contraband or incriminating evidence was found in these searches. Trooper Micilcavage admitted that defendant did not exhibit any signs that he was dangerous but Trooper Phillips thought defendant might be dangerous because he was acting nervous even though Phillips acknowledged that defendant never made any threatening moves or statements. At some point, defendant asked Trooper Phillips what right he had to search him and the trooper replied, “something to the effect of the right of self-preservation.”
*152 Meanwhile, Trooper Micilcavage had completed the registration check on the vehicle which confirmed defendant’s statement that it was registered to Ricky Spencer. Micilca-vage also received a radio transmission that Spencer was known to be a burglar and had been arrested on burglary charges in the past. There was no indication, however, that the car had been stolen or improperly registered or that defendant was in any way involved in criminal activity. Micilcavage exited the troop car, went over to Phillips and conveyed to him the information he had received. Phillips continued to question defendant while Micilcavage walked around the vehicle to the driver’s side. Micilcavage then shined his flashlight through the open door looking for drugs or other contraband. On that sweep of his flashlight Micilcavage noticed a shotgun which was partially wrapped in a towel or shirt and was lying on the floor under the dashboard where a driver’s legs would be positioned. The trooper then reached in, removed the shotgun and checked to determine whether it was loaded, which it was not. Micilcavage took the gun over to Phillips who radioed in the serial number for a “special file check”. The check came back negative, meaning that there was no record that the weapon had been stolen or was otherwise wanted by the police.
Micilcavage asked defendant if the weapon was his and where he had obtained it. Defendant replied that it had been given to him as a gift by his father and questioned the troopers’ authority, saying that he felt he was being detained too long and that he wanted to go. Defendant was asked if he could produce papers to show that the gun was his and he said that he believed his father had papers showing his ownership. An additional radio transmission then came in indicating that defendant was a friend of Spencer, that defendant and Spencer “hung together”, and that defendant had previously been arrested for a burglary. In order to test whether defendant was familiar with the criminal justice system, Trooper Micilcavage asked defendant if he had a “PO”, an abbreviation for parole or probation officer. Defendant identified his probation officer and divulged some of the terms of his probation. Micilca-vage then said, “Well, if you’re a felon and are in possession of that shotgun, you’ve committed a crime.” Defendant *153 responded that he had been arrested for a felony but that it had been taken care of. He further explained that he had talked to his probation officer regarding whether he could possess the gun and that the officer was unsure about it but was going to check on it for him. Trooper Micilcavage then gave defendant his constitutionally required preinterrogation warnings. The gun was confiscated and defendant was advised that he would be contacted and would be asked to bring in papers establishing its ownership. The troopers issued an equipment violation ticket to defendant and let him go. They then followed defendant for some distance to his girlfriend’s house.
Several days later, on November 2, 1981, Investigator John Daniel Johnson went to the home of defendant’s girlfriend to interview defendant. It had by then been determined that the shotgun had been stolen in a burglary which was one of a series of burglaries, and a Bobby Hammond had disclosed that defendant “was traveling with Mr. Spencer”. Defendant’s girlfriend at first informed Investigator Johnson that defendant was not there; however, after Johnson told her that he thought defendant was in the home she let him in and defendant agreed to speak with Johnson about the burglary “unofficially” in a “man-to-man” conversation. Defendant voluntarily went outside to the investigator’s car where, during a conversation with Johnson, he admitted his involvement in the burglary. Defendant was then permitted to go back into the house to talk with his girlfriend, after which he agreed to accompany Johnson to the police station. At the station, Johnson spoke over the phone with the Broome County District Attorney who promised that no further charges would be brought against defendant if he provided a written statement about the burglary. Thereafter, defendant signed such a statement, also admitting the disposal of numerous guns stolen in other burglaries.
By indictment dated December 18, 1981, defendant was charged with burglary in the second degree. Defendant moved to suppress the shotgun which had been seized and the admission which he had made, arguing, inter alia, that they were products of an illegal seizure of his person and an illegal search of the car. A suppression hearing was conducted on March 4, 1982.
*154 County Court denied the motion in an oral opinion on March 8, 1982. The court found that the inquiry made by Troopers Phillips and Micilcavage on October 29, 1981 “was on reasonable grounds and reasonably conducted, inasmuch as they were appropriately at the parking lot at 3:00 or 4:00 in the morning, that the defendant approached and stopped his car, got out of it, approached the troopers and the extent and nature of their inquiry at that time was reasonable and appropriate to all the circumstances.” The court ruled that, “As the discussion between the troopers and the defendant proceeded, in light of statements made by him which were contradictory and apparently evasive, as well as his physical condition as observed by the troopers, the nature of the inquiry made by them increased and was done so on a reasonable basis and for reasonable cause.” The court further held that Trooper Micilcavage’s use of a flashlight in discovering the shotgun did not require suppression and ruled that the gun had been properly observed in plain view[1] because the trooper had a right to stand outside the car and make a “general look” inside. The court also found that during the course of the inquiry defendant was not in custody or under arrest. Accordingly, the motion to suppress was denied. Defendant then pleaded guilty to attempted burglary in the second degree.
On defendant’s appeal, the Appellate Division affirmed, with two Justices dissenting. That court ruled that there was reasonable suspicion to inquire of defendant as to his identity and his reason for being in the parking area based on his presence in a known crime area at 4:00 a.m., his flashing the car lights off as if signaling and his backing the car up when he saw the troopers, notwithstanding the facts that he truthfully disclosed the car’s ownership, that he had no contraband on his person and that he was not participating in criminal activity when first observed by *155 the troopers. The court thought it significant that defendant never asked to leave and that there was no indication of forcible detention. According to the court, the nervous attitude of defendant, the evasiveness of some of his answers and the household goods observed in the car permitted the troopers to check out the vehicle, and thus the degree of interference by the troopers from its inception was reasonably related in scope to the circumstances which justified its initiation. Although the body search of defendant may have been unreasonable in the circumstances, the Appellate Division found that it could be disregarded because it revealed nothing and it did not intimidate defendant in any way. The court further ruled that the shotgun was properly seized because it had been observed in plain view[2] from outside the open car door and there was no showing that the troopers had stopped defendant in order to search the car. Consequently, the court also upheld the admissibility of defendant’s statements.
Defendant has appealed to our court by leave of a Justice of the Appellate Division.
If it be taken that the troopers initiated the original confrontation, we agree with the courts below that they had reasonable suspicion in the circumstances sufficient to warrant their stopping defendant and asking for his license and registration and an explanation of his conduct.
The suppression testimony, however, compels the conclusion as a matter of law that during the course of the inquiry defendant was detained and was not free to leave. The testimony disclosed that, when defendant got back in the car to look in the glove compartment for the registration, he tried to close the door but Trooper Phillips prevented him from doing so. Phillips testified that he had “let” defendant walk to an area to urinate, that he kept an eye on defendant in case defendant tried to drop anything and that he had defendant go back and stand by the car and not move while he went over to look in the area where defendant urinated to see if defendant had dropped anything. Phillips then had defendant empty his pockets out on the front of the car and the trooper frisked him.[3] During *156 the course of the confrontation, defendant was questioned extensively by Phillips, sometimes in a conceded effort to fluster him. During the course of the questioning defendant asked “What have I done?” and later asked what right the troopers had to search him. By their own testimony, the troopers at the termination of all their questioning of defendant “decided to let him go”. All of this evidence compels the conclusion that defendant was detained and was not free to leave (cf. Florida v Royer, 460 US 491, 493 [plurality opn]; People v De Bour, 40 NY2d 210, 216).
Nothing disclosed in the course of the troopers’ initial inquiry of defendant gave them any reason to hold defendant for more than the limited detention permitted on the basis of reasonable suspicion. The two different reasons given by defendant for his presence in the parking area, although at variance, along with defendant’s nervousness and other inconsistencies in his statements, provided no indication of criminality on his part which would .have justified further detention. The presence of personal household items in the vehicle, nonindicative in itself, was explained by defendant who stated that he was in the process of moving to his girlfriend’s home. That the officers received a radio transmission indicating that Spencer, who owned the car, was known to be a burglar was no evidence of criminal activity on defendant’s part and gave the officers no reason to detain him further (cf. Sibron v New York, 392 US 40, 64).
Once defendant had explained his conduct, produced his license, and identified the owner of the car, and such ownership had been confirmed by the radio check, the troopers had no justification to detain defendant longer. At this point the inquiry justified by the initiating circumstances had been exhausted, and no evidence of criminal conduct on defendant’s part had been discovered.
Inasmuch as the gun was discovered in consequence of defendant’s illegal continued detention, it should have been suppressed (cf. People v Allende, 39 NY2d 474, 477); inasmuch as the statements of defendant were obtained from him four days later in direct exploitation of the illegal *157 seizure of the shotgun and the discovery of its history, these statements, too, should have been suppressed as the product of defendant’s unconstitutional detention. (Cf. Brown v Illinois, 422 US 590.)
For the reasons stated, the order of the Appellate Division should be reversed, defendant’s plea and conviction vacated, the shotgun and defendant’s statements suppressed, and the action remitted to Broome County Court for further proceedings on the indictment.
Chief Judge Cooke and Judges Jasen, Wachtler, Meyer, Simons and Kaye concur.
Order reversed, plea and conviction vacated, the shotgun and defendant’s statements suppressed, and case remitted to Broome County Court for further proceedings on the indictment.

. The determination in this case does not properly call for consideration of the so-called “plain view” legal doctrine — that suppression is not required where the police officer “had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused” (Coolidge v New Hampshire, 403 US 443, 466). The fact that an object is discovered because it is openly visible does not automatically trigger the requirements of the “plain view” doctrine and indeed may often involve no search at all.

. (See n 1, p 154, supra.)

. Although the trooper’s actions turned up no contraband or incriminating evi *156 dence, they show that defendant was detained at ⅛⅛ point and not free to leave.