■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HECTOR BARRERAS, Appellant. [677 NYS2d 526] —Judgment, Supreme Court, Bronx County (Eugene Oliver, Jr., J.), rendered April 26, 1996, convicting defendant, after a jury trial, of criminal possession of a controlled substance in the third degree, criminal possession of a controlled substance in the seventh degree, criminal possession of a weapon in the third degree, and unlawful possession of marihuana, and sentencing him, as a second felony offender, to concurrent terms of imprisonment of 4½ to 9 years and 1 year, a consecutive term of 2 to 4 years, and time served, respectively, unanimously reversed, on the law, defendant's suppression motion granted and the matter remanded for further proceedings.

At a combined *Mapp/Huntley* hearing conducted prior to trial, Police Officer William Planeta testified that, on November 24, 1993, he was on plainclothes anti-crime patrol with two other officers, in an unmarked police car. At approximately 11:45 P.M., he observed defendant drive his car past stop signs located at the intersection of Davidson Avenue and 184th Street in the Bronx, without stopping or slowing down. Officer Planeta followed defendant's car through the intersection and signaled for defendant to pull his car to the side of the road. Defendant complied as directed.

Officer Planeta approached the driver's side of defendant's vehicle on foot, while the two other officers approached the passenger side and rear of the vehicle. Officer Planeta then asked defendant for his license, registration and insurance card. As defendant retrieved the papers from his wallet, the officer testified that defendant did not look directly at him, and that defendant's hands were shaking when he handed over the

requested papers. According to Officer Planeta, defendant did not reply when he told him he had been stopped for a traffic infraction. Furthermore, he testified that defendant appeared to be "extremely nervous" during the encounter. Since the required papers were in order, the officer believed that defendant's nervousness was unusual. Thus, the officer "suspected that perhaps there was something in that car that there shouldn't be—contraband", or that defendant "could be wanted for something", and asked defendant "if he had anything in the car that he shouldn't have". Defendant, still appearing to be unusually nervous, responded negatively.

The officer testified that, in an attempt to give defendant a "false sense of security" and to convey the impression that if he looked into the car he "wouldn't look that hard", he asked if defendant had "a machine gun, or a hand grenade, or a rocket launcher" in the car. The officer testified that, rather than the expected jocular reply he had received from other motorists in similar situations, defendant merely replied negatively. Officer Planeta also considered the possibility that defendant had a gun in the car, although he acknowledged that he was not in fear for his life at that point nor did he or his fellow officers have their weapons drawn.

Officer Planeta, without advising defendant that he could refuse the request, then asked defendant if he would "mind" if the officer looked through the car and defendant, still not looking directly at the officer, replied that it would be "okay". The officer then asked defendant if he could search the "whole" car and defendant responded "yeah, it's all right".

Without any of the three officers drawing a weapon, Officer Planeta asked defendant to step out of the car and stand to the rear of the car, where his partner was standing. As defendant passed by him, Officer Planeta patted defendant down "briefly", and then "pushed him to the rear of the car". Officer Planeta then looked into the car with the aid of a flashlight, as did Sergeant Hollyfield.

Observing nothing that could "hurt" him, Officer Planeta then opened the front console of the car and saw papers and cassette tapes inside. Moving the items to see what, if anything, was underneath, Officer Planeta noticed that the liner of the console shifted. He then removed the liner and found underneath it a black handgun lying on top of a clear plastic bag containing smaller plastic bags of what appeared to be cocaine and marijuana. Following that discovery, defendant was arrested and handcuffed.

Officer Planeta also recovered from the car a cellular

telephone, two calculators and a radar detector. In a search of defendant incident to arrest, Officer Planeta recovered papers containing telephone numbers and other information, a pager and $2,423 in cash.

Defendant was taken to the precinct, where he was given *Miranda* warnings at the front desk and agreed to speak with the police. About 30 to 45 minutes later, defendant was asked pedigree questions. During that questioning, Officer Planeta asked defendant whether or not he used drugs, adding that drugs were found in the car. At that point, defendant stated that he did not know the "stuff" was in the car, which had been borrowed by a friend, and suggested that the friend might have knowledge of the contraband. However, defendant refused to give the name of the individual who had borrowed the car. In addition, when asked if he was employed, defendant said that he worked "off the books" as a bouncer at an unnamed club. A summons for the traffic violation was issued to defendant at the precinct.

On January 1, 1995, more than two years after defendant's arrest, Officer Planeta went to the intersection of 184th Street and Davidson Avenue and took a photograph that showed stop signs at that location. He testified at the hearing that the photograph accurately represented the appearance of the intersection at the time of defendant's arrest.

Defendant testified at the hearing, *inter alia*, that he was stopped by the police after going through the intersection of Davidson Avenue and 184th Street; that he was nervous because he was approached by three individuals displaying police badges at a late hour on an otherwise deserted street; and that he did not look directly at the officer standing near the driver's door because the officer, holding a flashlight, stood at the rear of the door and defendant could not turn completely around to face the officer. Defendant testified further that after he was asked to step out of the car, the officers began to search the interior of the car and that he did not give permission for the search.

Defendant testified further that he did not recall seeing any stop signs at the intersection in question, and that on November 26, 1993, the day following his arraignment in this case and two days after his arrest, defendant went to the intersection and took three photographs, entered into evidence, that showed no stop signs at the intersection. Defendant testified that these photographs accurately depicted the intersection at the time of his arrest. In addition, the summons that was issued to defendant at the precinct for the alleged traffic violation was eventually dismissed.

In a decision dated February 27, 1995, the hearing court credited the testimony of Officer Planeta and found the facts to be in accordance therewith. Although the court noted that the evidence regarding the existence of the stop signs at the time in question was "inconclusive", it found that defendant was stopped by the police in this case "after being observed going through a stop sign without stopping", and held that a violation of the Vehicle and Traffic Law is "a legitimate reason for police to justifiably stop a motorist", citing *People v Ingle* (36 NY2d 413). The court held further that, according to. the credited testimony of Officer Planeta, "defendant did in fact consent to the search of his car". In support of this determination, the court ruled that the police officers "did not act unreasonably and exert force or coercion over the defendant"; that defendant was "not in custody at the time of the stop"; that defendant's prior felony conviction indicated that he was "not a novice to the criminal justice system"; and, that the totality of the circumstances indicated that "defendant's act of consent was voluntary". Thus, the court denied defendant's motion to suppress physical evidence.

Regarding the *Huntley* issue, the court granted defendant's motion to suppress only his statement denying knowledge of the drugs and gun in the car, finding that the police went beyond pedigree questions by asking defendant if he used drugs "because you did have drugs in the car".

We disagree with the denial of the motion to suppress physical evidence and reverse accordingly.

Unless there is a validly obtained consent, justification for a full scale search of a vehicle as occurred here must be predicated upon probable cause to arrest an occupant coupled with reason to believe the car contains related evidence or a weapon (*People v Belton*, 55 NY2d 49, 54-55; *People v Langen*, 60 NY2d 170, 181, *cert denied* 465 US 1028; *see, Pennsylvania v Labron*, 518 US 938). Although advanced at the suppression hearing, the People do not argue the automobile exception here. Rather, they argue that a request to search a vehicle *during the time* necessary to resolve the underlying reason for the stop is appropriate. However, "[a] traffic stop constitutes a limited seizure of the person of each occupant (*People v May*, 81 NY2d 725, 727; *People v Harrison*, 57 NY2d 470, 476)" (*People v Banks*, 85 NY2d 558, 562, *cert denied* 516 US 868; *see, Florida v Bostick*, 501 US 429). Thus, the request to search cannot be analyzed in a vacuum and the length and circumstances of the continued detention must be considered. "For a traffic stop to pass constitutional muster, the officer's action in

stopping the vehicle must be justified at its inception and the seizure must be reasonably related in scope, including its length, to the circumstances which justified the detention in the first instance (*United States v Sharpe*, 470 US 675, 682; *see also, Florida v Royer*, 460 US 491, 500 [plurality opn])" (*People v Banks, supra*, at 562).

Once defendant's papers were all found to be in order, the officers, without more, were obligated to issue the stop-sign summons and allow defendant to resume his journey, i.e., "the initial justification for seizing and detaining defendant * * * was exhausted" (*People v Banks, supra*, at 562, *People v Milaski*, 62 NY2d 147, 156). Unlike *People v Battaglia* (86 NY2d 755), where the driver of the vehicle provided what police rationally concluded was a false identification, or *People v Tejeda* (217 AD2d 932, *lv denied* 87 NY2d 908), where the defendant was stopped as the result of a radio call that he had stolen gasoline from a gas station and his responses were illogical and suspicious, nothing in defendant's conduct or demeanor here provided a further basis to detain him.

The arresting officer testified about defendant's extreme nervousness being unusual. However, any citizen alone late at night might appear nervous under those circumstances. In any event, "nervousness", even coupled with "innocuous discrepancies" in response to questions, does not justify continued detention (*People v Banks, supra*, at 562). Nor did defendant's failure to look directly at the inquiring officer provide a basis for further suspicion—the People's witness conceded that all of the officers had flashlights and at least two of them were shining them in or about the car.

As a general matter, a request for information involves basic, nonthreatening questions regarding, for instance, identity, address or destination and such questions need only be supported by an objective, credible reason not necessarily indicative of criminality. "Once the officer asks more pointed questions that would lead the person approached reasonably to believe that he or she is suspected of some wrongdoing and is the focus of the officer's investigation, the officer is no longer merely seeking information. This has become a common-law inquiry that must by supported by a founded suspicion that criminality is afoot" (*People v Hollman*, 79 NY2d 181, 185).

Even if the officers had been justified in further detaining defendant and seeking consent to search the interior of the vehicle, we disagree with the IAS Court's conclusion that the defendant "did in fact consent to the search of his car." Consent must be voluntary, that is, the "unequivocal product of an es-

sentially free and unconstrained choice", and the People have the "heavy burden" of proving the voluntariness of any purported consent (*People v Gonzalez*, 39 NY2d 122, 128). Whether a consent to search is voluntary or not is a question of fact to be determined from all of the circumstances. Given the late-night circumstances described above, coupled with the specific, accusatory nature of the questioning (*People v Hollman, supra*, at 194), defendant's consent cannot be deemed voluntary. Concur—Milonas, J. P., Nardelli, Mazzarelli and Andrias, JJ.