(September 26, 2002)

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DERRALL FAINES, Appellant. [747 NYS2d 484]

At a combined *Mapp/Huntley/Dunaway* hearing held prior to trial, Police Officer Brendan Regan testified that on April 17, 1998, he was on duty with his partner, when he observed de-

fendant, who was driving a 1992 Mazda, change lanes without signaling and make an "erratic," "short-cut" left turn. Officer Regan pulled defendant over. Both defendant and his passenger, codefendant Calvin Langhorn, rolled down their windows. Officer Regan approached the driver's side and his partner, Police Officer Kimberly Ferrino, approached the passenger side. Regan informed defendant that he had not signaled when he turned and asked defendant for his license and registration. Defendant produced his license but could not find the registration or insurance card for the Mazda, which he claimed belonged to his girlfriend. The officer ascertained that the car was insured and was registered to the name defendant gave as the owner. Nevertheless, Officer Regan testified that defendant was "very, very nervous, shaking[,]" observing further that "[i]t was in April[,]" and "[h]e began to really sweat[.]" Langhorn also noticed the sweat coming from defendant's forehead.

The hearing court specifically credited the testimony of Officer Regan in which he stated that he asked defendant if there was any reason why he was so nervous. Defendant replied that he had "a bag of weed" on him, took a bag of marijuana from his jacket pocket, and handed it to Officer Regan.

Langhorn also testified for the People at the hearing, but his differing version was not fully credited by the hearing court. He related that Officer Regan had stated, "why do you look so nervous" and then asked "is there anything in the car that shouldn't be there?" After neither responded, again according to Langhorn, Officer Regan said, "if you got anything in the car you ain't supposed to have, we work deals out in Washington Heights." Defendant did not reply, but after a minute or two, while, according to Langhorn, Officer Regan repeated this "over and over," defendant then reached into his pocket and handed the officer a bag of marijuana.

Officer Regan testified that since defendant turned over the marijuana, he advised defendant that he and his partner were going to search the car, and, if there was anything else inside, they "should know about it now." According to Langhorn, Officer Regan repeated this remark. Defendant then turned to Langhorn, extended his hand to him and said "give me that." Langhorn reached between his legs and handed defendant a bag containing over four ounces of cocaine. Defendant gave the bag to Officer Regan, and the police arrested both defendant and Langhorn.

In a written decision, dated February 3, 1999, the hearing court credited, as limited by its findings, the testimony of the

People's witnesses. Specifically, the court found that upon observing that defendant was "shaky" and "sweat was forming on his head," Officer Regan asked "if there were [sic] any reason why he was so nervous." The court accepted this testimony, finding that Officer Regan had an objective reason to stop defendant for the traffic violation; that he had made an appropriate inquiry as to why defendant was so nervous; and that once defendant volunteered the marijuana, Officer Regan possessed probable cause to arrest him and to search the car for additional contraband. The court also found that Officer Regan's inquiry, after defendant voluntarily turned over the marijuana, as to whether there was anything else in the car that the officers should know about, was not a custodial interrogation requiring *Miranda* warnings.

At defendant's first trial, the jury convicted him of unlawful possession of marijuana, acquitted him of the charge of possession with intent to sell, and was unable to come to a unanimous verdict on the first-degree possession charge. Upon retrial, the jury convicted defendant of criminal possession of a controlled substance in the first degree (weight in excess of four ounces).

Defendant now argues that the court should have granted his motion to suppress the drugs and his verbal statements and nonverbal expressions to the police. He reasons that Officer Regan made improper accusatory inquiries and the police should have read defendant his *Miranda* rights before asking the final question, to wit, whether there was anything the police should know about before they searched the car.

Initially, we note that defendant does not challenge the initial stop, which was clearly justified based on the traffic infraction the arresting officer saw (*People v Robinson*, 97 NY2d 341, 348-349).

In making his suppression arguments, defendant relies upon the codefendant's testimony as to the encounter, rather than the officer's. At the hearing, although the codefendant was a People's witness and testified that Officer Regan asked several questions before defendant turned over the marijuana, Officer Regan testified he asked only one. The hearing court, however, credited the officer's version. Notably, defendant does not challenge the factfinder's determinations made at the suppression hearing. These findings are entitled to great weight on appeal (*People v Prochilo*, 41 NY2d 759). As defendant does not specifically contest these fact findings, we need not exercise our independent factual review power to evaluate the hearing testimony with an eye toward making or entertaining new credibility

determinations. In any event, were we to do so, we would find ample evidentiary support for the hearing court's factual decisions.

After considering the uncontested findings of fact the hearing court made, we find that defendant's motion to suppress was properly denied. Pursuant to *People v De Bour* (40 NY2d 210, 223), "[t]he minimal intrusion of approaching to request information is permissible when there is some objective credible reason for that interference not necessarily indicative of criminality [a level I inquiry]." As clarified by *People v Hollman* (79 NY2d 181, 185), a request for information pursuant to a level I inquiry "involves basic, nonthreatening questions regarding, *for instance*, identity, address or destination" (emphasis added). However, "[o]nce the officer asks more pointed questions that would lead the person approached reasonably to believe that he or she is suspected of some wrongdoing and is the focus of the officer's investigation, the officer is no longer merely seeking information" and the level of inquiry has been raised to a "common-law inquiry that must be supported by a founded suspicion that criminality is afoot" (*id.*).

Notably, the *Hollman* Court, by employing the phrase "for instance," has told us that level I inquiries are not necessarily, nor always, limited to questions which only seek a person's "identity, address or destination." The Court's language makes two requirements of a lawful level I inquiry clear to us. First, it may not involve "pointed questions," which transform an encounter from one with a merely business-like tint to one with an intimidating or accusatory tone. Second, level I inquiries, when viewed in the aggregate, may not create a reasonable belief that the approached person is an investigatory target. If the encounter meets these two tests, the officer has not crossed the line into prohibited level II territory.

We find that, based on the suppression court's findings of fact, Officer Regan's lone question in response to defendant's manifest nervousness was in no way inappropriate. Here, the officer's single question was the type of innocuous inquiry which could have been reasonably perceived as evidence only of a concern for defendant's well being, and not one commonly or plainly designed to elicit incriminating statements. The officer's conduct "never exceeded a request for information" and the questioning "was neither invasive nor focused on possible criminality" (*People v Tejada*, 270 AD2d 655, 656, *lv denied* 95 NY2d 805; *cf. People v Thornton*, 238 AD2d 33 [police inquiry "Hey, fellows, what's up, how are we doing?" of two men on bicycles found not to be even a level I inquiry]). Thus, the

questioning was proper when measured by the reasonableness standard "which requires a weighing of the degree of intrusion against the precipitating and attending circumstances" (*People v Durgey*, 186 AD2d 899, 900, *lv denied* 81 NY2d 788).

Moreover, defendant's unprovoked and wholly voluntary act, in response to the officer's sole inquiry focused only on defendant's obvious nervousness, went far beyond what the officer's words could reasonably expect to evoke. Officer Regan took no action to look for or seize the marijuana or any other contraband before defendant himself instantaneously acted to remove the marijuana from his pocket and hand it to Regan.

Similarly, in *People v Nelson* (266 AD2d 730, *lv denied* 94 NY2d 865), the sheriff stopped the defendant's car because the rear license plate was not illuminated. While reviewing the license and registration, the sheriff saw a cigar box and asked, "[W]hat's the box for?" (*Id.* at 731.) With no additional prompting from the sheriff, defendant then opened the box, which plainly and visibly contained crack cocaine. The reviewing court was not convinced that the sheriff's "innocuous question" and the ensuing events "worked an unreasonable intrusion," as the question was not followed by the officer's request to examine the contents of the box nor to consent to a search of the car (*id.* at 732).

Were we to grant suppression here, an officer observing a trembling, profusely sweating individual during a level I encounter would virtually be forced to ignore these self-evident observations. Such restrictions on police activity would make little or no sense, would be unreasonable and counterintuitive, and, likewise, would not broaden in any meaningful way a private citizen's right to be free of arbitrary state intrusions.

Defendant's reliance on *People v Berberena* (264 AD2d 670, *lv denied* 94 NY2d 901) and *People v Barreras* (253 AD2d 369) is misplaced. In *Berberena*, upon observing the defendant's "minimal and equivocal" nervous behavior, the police asked accusatory questions and—unlike Officer Regan herein—asked for permission to search the car. In *Barreras*, the police stopped defendant for a traffic infraction. After they ascertained that his documentation was in order, he appeared extremely nervous. The police, also unlike here, asked *repeated questions* about whether defendant had specific types of contraband in the car, asking also if they could search the car. Since the police conduct in both those cases was significantly more intrusive than here, they provide no support for defendant's position.

Defendant also argues that, after producing the marijuana, Officer Regan should not have asked if there was anything else

in the car without first reciting *Miranda* warnings. However, this argument is flawed for two reasons. To begin with, once defendant produced the bag of marijuana, the police acquired the necessary probable cause to arrest him and, with it, the legal authority to conduct a search incident to that arrest (*People v Smith*, 59 NY2d 454, 458-459; *see also People v Langen*, 60 NY2d 170, 180-181, *cert denied* 465 US 1028). Second, at the moment the police saw and recovered the marijuana in defendant's possession, "there clearly was reason to believe that the automobile might contain other drugs" (*People v Belton*, 55 NY2d 49, 55) and, therefore, the police were justified in searching the car pursuant to the automobile exception to the warrant requirement (*id.*; *see also People v Langen, supra* at 180-181). That the police did not act to arrest defendant— based on the probable cause they had upon seeing the marijuana in defendant's possession—until after his codefendant produced the bag of cocaine, unnecessarily exalts form over substance and protects nobody's legitimate privacy rights.

With respect to defendant's remaining contentions, we find the trial court did not improvidently exercise its discretion in allowing the prosecutor to cross-examine defendant about two prior felony drug convictions as they demonstrated defendant's willingness to place his own interests above society (*see People v Bennette*, 56 NY2d 142, 147). Further, the trial court properly allowed the prosecutor to elicit testimony from Langhorn about prior drug transactions with defendant (*see People v Boyd*, 164 AD2d 800, 803, *lv denied* 77 NY2d 904) as the testimony was relevant to the issue of intent (*see People v Battes*, 190 AD2d 625, *lv denied* 81 NY2d 1011) and inextricably interwoven with the narrative of the crime (*see People v Radoncic*, 259 AD2d 428, *lv denied* 93 NY2d 1005; *People v Mendez*, 165 AD2d 751, *lv denied* 77 NY2d 880).

The jury verdict was not against the weight of the evidence. Resolution of credibility issues, as well as the weight to be accorded to trial evidence, are primarily questions for the jury, which heard and saw the witnesses and other proof (*see People v Gaimari*, 176 NY 84, 94). The jury's determination should be accorded great weight on appeal and should not be disturbed unless clearly unsupported by the record (*see People v Garafolo*, 44 AD2d 86, 88).

Defendant's constitutional challenge to his sentence is unpreserved for review. In any event, we note that defendant received the minimum sentence authorized by law. Concur— Williams, P.J., Tom, Rosenberger, Wallach and Marlow, JJ.