■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v DAVID HOLLAND, Respondent. [904 NYS2d 10]—

Order, Supreme Court, New York County (Bonnie G. Wittner, J.), entered November 26, 2008, which granted defendant's motion to suppress physical evidence and statements, reversed, on the law, the motion denied, and the matter remanded for further proceedings consistent herewith.

On December 30, 2007, a team consisting of Police Officers Porras, Woodard and two others was on patrol in the vicinity of a public housing development. The area had been earmarked for patrol because of reports of drug dealing, robberies and gunshots. At approximately 1:40 A.M., the team approached a group of four to six individuals in front of 110 East 129th Street. Defendant, who was walking toward the group, changed his direction as the officers approached. Porras called out to defendant and asked him to stop. In response to Porras's questions, defendant stated that he did not live in the housing development. At Porras's request, defendant handed over photo identification. Porras testified that his investigation was complete at that point, since nothing about defendant's photo identification aroused his suspicion. Porras did not, however, return the identification to defendant. Woodard, who did not hear the conversation between Porras and defendant, began asking defendant some of the same questions put to him by Porras. Defendant became irate and punched Porras. A struggle ensued as the officers arrested defendant for assault and disorderly conduct. Upon the arrest, quantities of crack cocaine and marijuana were recovered from defendant's person. The motion court granted defendant's motion to suppress physical evidence, as well as his statements, reasoning that "[e]ven if there was a basis for initially requesting information from defendant, which there was not, any such justification was exhausted after he answered Porr[a]s who was obligated to return the identification and allow him to leave." The court further found that what it described as "continued detention" was unlawful, and defendant's reaction to it was "proportionate to the circumstances." We disagree.

Once defendant punched Officer Porras, any allegedly unlawful conduct in stopping and questioning defendant was attenuated by his calculated, aggressive and wholly distinct conduct (*see People v Mercado*, 229 AD2d 550 [1996]; *People v Stone*, 197

AD2d 356 [1993]). We distinguish *People v Felton* (78 NY2d 1063 [1991]), where there was no attenuation because the defendant's action in striking a police officer was in the words of the suppression court, "immediate, spontaneous and proportionate to the officer's attempt to lay hands on him when he refused to stop" (*id.* at 1064). Here, the police officers did not initiate any physical contact with defendant or attempt to do so before he punched Officer Porras. In this case, defendant's actions were far out of proportion to Officer Woodard's redundant questions. Hence, we disagree with the dissent's view that defendant's "minimal use of force in the attempt to get away from the officers was a direct consequence of his unlawful detention." For purposes of applying *Felton,* it is of no moment whether defendant punched or pushed Officer Porras, because, as stated above, the police officers did not initiate or attempt to initiate physical contact with defendant. For example, in *People v Sampson* (68 AD3d 1455 [2009]), the court found that a suspect's act in pushing a police officer did not dissipate the taint of an illegal stop because it was "a spontaneous reaction *to [the officer's] attempt to touch him,* and a direct consequence of the illegal seizure" (*id.* at 1458 [emphasis added]). In light of the foregoing, we need not resolve the issue of the legality of the police officers' stopping and questioning defendant (*see Mercado,* 229 AD2d at 551). Concur—Sweeny, Catterson and DeGrasse, JJ.

Tom, J.P., and Moskowitz, J., dissent in a memorandum by Tom, J.P., as follows: While under the circumstances of this case the police had an objective credible reason to approach defendant to request information, the officers' subsequent detention of defendant exceeded the scope of the permissible inquiry and violated his Fourth Amendment right to be free from undue interference with his liberty. Defendant's minimal use of force in the attempt to get away from the officers was a direct consequence of his unlawful detention and does not attenuate the illegally initiated police intrusion upon his freedom of movement.

Police Officers Porras and Woodard testified at a combined *Mapp/Dunaway/Huntley* hearing before a judicial hearing officer. In the early morning of December 30, 2007, they were working with three other uniformed police officers "doing a perimeter check" of the area "[i]n front of 120 East 129th in the Jackie Robinson Housing Development" in upper Manhattan. Porras first noticed defendant at about 1:40 A.M. as he and the other officers entered the housing development, an area where he had made a number of prior arrests, mostly related to illegal narcotics. Defendant was walking toward a group of four to six people gathered in front of the building, as were the offi-

cers. Porras testified: "Once he saw us, he changed direction right away. That caught my attention at the time." Porras approached defendant and asked whether he lived in the area or in the development, to which defendant responded, "No." Porras continued, "He was agitated at the time of the stop, and I asked him if he had any identification on him which he said he did and he presented it to me." Although defendant's identification card was in order, Officer Porras did not return it to him.

Woodard testified he became aware that Porras "was speaking alone with an individual and the individual was becoming a little loud and irate . . . After I approached, I asked Mr. Holland if he had identification, if he lived in the development." Even though defendant had already responded to these questions, Porras did not stop Woodard's inquiry. Defendant became more irate and louder. Woodard continued, "At this point in time Officer Arslanbeck had c[o]me over." Porras testified that defendant's "agitation" worried him and he "approached" the defendant. Woodard testified that defendant then "took a closed fist and swung at Officer Porras, turned around and tried to run through myself and Officer Arslanbeck . . . At that point in time we grabbed the defendant . . . and a struggle ensued." It took four officers approximately five minutes to subdue defendant, who was placed under arrest for "[a]ssaulting an officer, disorderly conduct and resisting arrest." He related that a bag of crack cocaine and a ziplock bag containing marijuana were recovered from defendant's person.

Porras gave a somewhat different version of the events leading up to the scuffle with defendant: "The defendant started acting very hostile. He started becoming very agitated," and took "one swing at me striking me in my shoulder, and when I flinched, he ran toward Officer Woodard. At that point, I went ahead and grabbed the defendant by the waist." During the resulting struggle, "he struck me again in the right forehead and underneath the right eye causing some swelling and small laceration." After three or four minutes, the officers were able to place defendant in handcuffs.

Defendant was charged with assault in the second degree, criminal possession of a controlled substance in the fifth degree and unlawful possession of marijuana. He moved to suppress statements and physical evidence as a result of the illegal stop and detention by the police.

Supreme Court granted defendant's motion to suppress testimony concerning any statements defendant may have given, and all physical evidence recovered, on the ground that the officers who confronted defendant lacked a reason to approach

him, and in any event, once defendant answered the questions put to him by Officer Porras and provided identification, "Porr[a]s' investigation was complete, since he found nothing about the identification that aroused his suspicion. Nevertheless, he did not return the identification, in this way preventing defendant from leaving . . . Porr[a]s then assisted Woodard and P.O. Robin in blocking defendant's egress . . . The continued detention was unlawful and the reaction of defendant proportionate to the circumstances. It does not attenuate the unlawful detention and render the contraband admissible."

On appeal, the People assert error in Supreme Court's finding that the police lacked a reason to approach defendant, arguing that defendant's "suspicious conduct within a crime-plagued, public housing area, late at night, only elevated the officers' predicate for inquiry." They also take issue with the court's portrayal of the officer's conduct as an "unlawful detention" of defendant, contending that Porras "was justified in his limited, non-accusatory questioning of the defendant," and assert that "Officer Woodard, in a very reasonable response to defendant's growing agitation, joined Officer Porras and unwittingly repeated Officer Porras' questions." Finally, the People dispute the court's finding that defendant's attempt to get away from the police officers was reasonable. In any event, they argue, "Defendant's striking Officer Porras was a completely independent act, which provided its own probable cause to arrest and attenuated the taint of any initial illegality from the contact between defendant and the police" (citing *People v Townes*, 41 NY2d 97 [1976]).

Deciding whether a search and seizure is reasonable under the Fourth Amendment requires that a court "consider whether or not the action of the police was justified at its inception and whether or not it was reasonably related in scope to the circumstances which rendered its initiation permissible" (*People v Cantor*, 36 NY2d 106, 111 [1975]). While defendant does not concede the legitimacy of Porras's approach, the police are "given wide latitude to approach individuals and request information" (*People v De Bour*, 40 NY2d 210, 218 [1976]), which is construed as a "minimal intrusion" on individual privacy and security requiring only "some objective credible reason for that interference not necessarily indicative of criminality" (*id.* at 223). Defendant's presence "after midnight in an area known for its high incidence of drug activity" and his change of direction "to avoid walking past the uniformed officers" warranted Porras's approach to inquire about defendant's identity (*id.* at 220). Moreover, it has been observed that the right of the police

to approach an individual to request information exists even absent any concrete indication of criminality (*People v Gray*, 90 AD2d 405, 407 [1982]).

Analysis turns to whether the subsequent action of the police was, in the *Cantor* Court's words, "reasonably related in scope to the circumstances which rendered its initiation permissible" (36 NY2d at 111), i.e., to Porras's request for information as a result of defendant's abrupt change of direction. As Supreme Court observed, upon receiving defendant's identification and finding nothing suspicious about it, the objective of Porras's inquiry was fulfilled and his investigation at an end. As this Court noted in *People v Barreras* (253 AD3d 369, 373 [1998]), once a defendant's papers are found to be in order, the initial justification for a stop is exhausted, and the police are obligated to permit the defendant to resume his journey. The salient characteristic of a request for information is that an individual who is approached by police must always be free to simply walk away (*see People v Flynn*, 15 AD3d 177, 178 [2005], *lv denied* 4 NY3d 853 [2005]).

Whether defendant's continued detention was proper depends on whether the circumstances afforded Porras and his fellow officers the minimum basis for a lawful detention—"a founded suspicion that criminal activity is afoot" (*Cantor*, 36 NY2d at 114)—so as to elevate the permissible intrusion with defendant's liberty beyond the minimally intrusive request for information (*see People v Leary*, 255 AD2d 527, 528 [1998]) to the next level of interference—the common-law right to inquire—which "permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure" (*De Bour*, 40 NY2d at 223). The People, however, do not contend that the officers possessed the necessary basis to elevate their inquiry to this level, which requires a founded suspicion that criminal activity is afoot. Rather, they avoid the question of detention by attempting to minimize the level of intrusion upon defendant's liberty and justify the seizure of evidence on an independent ground.

The record indicates that the officers' confrontation with defendant progressed beyond a simple request for information. Although defendant had finished answering the questions put to him by Porras, who determined that defendant's New York State identification card was in order, the officer nonetheless retained the card. The following exchange took place during the testimony of Porras at the suppression hearing:

"THE COURT: Now, with that would that not necessarily complete your investigation at that point, yes or no?

"THE WITNESS: No.

"THE COURT: No. What else did you have to do?

"THE WITNESS: At that point Officer Woodard wanted to ask him a few questions.

"THE COURT: What did he ask him?

"THE WITNESS: If he lived in the area as well.

"THE COURT: Well, he already answered that. What else did he ask?

"THE WITNESS: I don't remember anything else he asked."

On his cross-examination, Woodard stated that when Porras began speaking to defendant, he and Officers Arslanbeck and Robin were some 20 to 25 feet away. Woodard confirmed that when he asked defendant if he lived in the development and requested his identification, Porras did not communicate that he had previously asked the same question and that he was already in possession of defendant's New York State identification card. Woodard stated, "Mr. Holland was being loud, boisterous . . . It appeared that I had agitated him." Within 10 or 15 seconds of Woodard's follow-up request for identification, Arslanbeck arrived. Defendant was now confronted by at least three police officers, with a three-foot-high fence directly behind him, and was being subjected to repetitive questioning, while Porras continued to hold his identification card. It is reasonable to conclude, from these circumstances, that defendant was being subjected to harassment and intimidation (*cf. De Bour*, 40 NY2d at 220). In any event, the circumstances of the encounter are wholly inconsistent with a belief on defendant's part that he could reasonably disregard the police and go about his business (*see Florida v Bostick*, 501 US 429, 434 [1991]). "An individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away" (*People v Howard*, 50 NY2d 583, 586 [1980], *cert denied* 449 US 1023 [1980]).

Commendably, the People do not argue that defendant's agitation provided a founded suspicion of criminality, which is a position that the courts have rejected as devoid of merit (*see People v Banks*, 85 NY2d 558, 562 [1995], *cert denied* 516 US 868 [1995] [defendant's nervousness and minor discrepancies between his and his passenger's answers regarding their trip did not support reasonable suspicion of criminality]; *People v Milaski*, 62 NY2d 147 [1984]). Nor do they suggest that defendant presented any threat to the personal safety of the police. Rather, the People contend that an entirely separate justification for defendant's arrest was provided by his aggressive behavior toward

Porras after Woodard questioned him and Arslanbeck arrived on the scene, which was described by Woodard as a strike with a "closed fist" landing "in the face area," and by Porras, variously, as a "punch" and a "push" to the shoulder. The officers' testimony was inconsistent with the information they recorded in their memo books, which reflect defendant's initial action as a "push."

The documentary evidence clearly showed that defendant was first detained/restrained before he tried to break away and that he pushed Porras, but had not thrown a punch at any time before he was detained. Woodard was impeached with his memo book, in which he entered, "Perp did push two AO's upon detainment," indicating himself and Porras. The entries by Porras described the events surrounding the officers' perimeter check in more detail: "Multiple stopped including Holland, David DOB [xx]/[xx]/84 for poss. drug sales—perp did push (2) A/O's; upon detainment perp did punch A/O w/ closed fist, perp was resisting being put in handcuffs approx 5 min."

On cross-examination, Porras stated that at the time defendant became aggressive, "I had his identification still." When counsel inquired about the circumstances resulting in defendant's arrest, Porras responded, "Yes—well he pushed me. Pushed the officer." Asked if they were pushed because defendant was attempting to leave, Porras responded, "He was trying to—Yeah, he was trying to go." When the court inquired, "At what point did he push you?" the witness stated, "After he spoke to Officer Woodard."

Having failed to contest the issue of unlawful detention, the People seek to use the limited force employed by defendant in his attempt to get away from the police as an independent basis for his arrest, thereby attenuating the search and seizure of the contraband found on his person from the unlawful police conduct. They argue that "defendant's striking Officer Porras was not provoked by Woodard's repetitive questions. It was an act of aggression that went far beyond the conversation the officers were attempting to have with defendant." The People rely on *People v Townes*, in which a suspect subjected to the unconstitutional seizure of his person pulled a gun and attempted to fire it, even after the officers had identified themselves. Under those circumstances, the Court of Appeals held that the defendant's "act was unjustified and criminal in nature (see Penal Law, § 35.27) and unrelated to the initial albeit unlawful action on the part of the police" (41 NY2d at 102).

Relying on *People v Felton* (78 NY2d 1063 [1991]), defendant counters that his attempt to get away from the officers does not

serve to attenuate the seizure from the unlawful police conduct "because it was an immediate, spontaneous and proportionate reaction to the unjustified detention." He notes that the testimony of Porras and Woodard, as well as the documentary evidence, confirms that he was prevented from departing, thereby exceeding the scope of a police request for information, and requiring suppression of the evidence obtained.

Despite some transparent attempts to elaborate upon the facts, the record is clear and supports the hearing court's determination that defendant was prevented from leaving the scene, and that his reaction was a proportionate response to the unlawful detention. Here, as Woodard questioned defendant, other officers gathered around defendant, who was backed up against a fence. There was no evidence offered at the hearing to show that the officers had kept a path open to allow him to leave at any time he wished. The memo book entries are a contemporaneous record of the officers' activities, maintained as part of their official duties, and constitute the most reliable account of their encounter with defendant. In the seven months that intervened between arrest and hearing, the officers' recollection of the incident, particularly the sequence of events, had obviously become impaired because Woodard's testimony was inconsistent with that given by Porras, and Porras could not seem to recall whether he was first punched or pushed by defendant, although he was certain that defendant was trying to get away. The arresting officers were presumably cognizant of the need to justify their detention of defendant in order to preserve the physical evidence against him. What is consistently described in the documentary evidence as a push was subsequently represented at the hearing by Porras as a punch to the shoulder and by Woodard as a punch to the face.*

As noted in *Cantor* (36 NY2d at 112), "Street encounters between the patrolman and the average citizen bring into play the most subtle aspects of our constitutional guarantees. While the police should be accorded great latitude in dealing with those situations with which they are confronted it should not be at the expense of our most cherished and fundamental rights. To tolerate an abuse of the power to seize or arrest would be to abandon the law-abiding citizen to the police officer's whim or caprice—and this we must not do. Whenever a street encounter amounts to a seizure it must pass constitutional muster."

At the time Porras completed his questioning of defendant,

---

* The People do not attempt to justify defendant's arrest on the basis of any injury sustained by an officer during the struggle to place defendant in handcuffs.

the purpose of the initial police approach was fulfilled. The continued retention of defendant's identification by Porras and the second series of the same questions put to defendant by Woodard elevated the degree of interference with defendant's liberty beyond the limited duration and scope permitted by a request for information (*see People v Mobley*, 48 AD3d 374, 375 [2008] [officers' second approach to request information was impermissible after they found nothing suspicious on their first approach]).

It was conceded by both Porras and Woodard that defendant was attempting to get away from the officers. As stated by Woodard, after pushing Porras, defendant "tried to run through myself and Officer Arslanbeck," and as stated by Porras, "Yeah, he was trying to go." The testimony establishes that after Porras completed his request for information, he was immediately joined by Woodard, and 10 to 15 seconds later by Arslanbeck; that the officers positioned themselves in front of defendant; and that defendant was standing directly in front of a three-foot fence. It is apparent from the congruous testimony of the two officers and the entries in their memo books that defendant tried to push Porras out of the way and escape between Woodard and Arslanbeck. It is equally apparent that the nature of the officers' confrontation with defendant had progressed from "basic, nonthreatening questions regarding, for instance, identity, address or destination" that characterize a request for information (*Barreras*, 253 AD2d at 373) to "harassment or intimidation" stage (*De Bour*, 40 NY2d at 220) of an improper detention based on no more than vague suspicion (*see Cantor*, 36 NY2d at 114).

In view of the officers' concession that defendant was trying to get away from them, the documentary evidence and Porras's eventual admission at the hearing that defendant pushed him, the limited physical force used against Porras by defendant was an immediate response to his unjustified detention. It does not constitute an independent act sufficiently attenuated from the unlawful detention so as to dissipate the illegal taint associated with it (*cf. Townes*, 41 NY2d at 101-102), but was an immediate and direct consequence of that unlawful detention. There is thus no basis upon which to find attenuation and admit the evidence. As this Court noted in *People v Packer* (49 AD3d 184, 186 [2008], *affd* 10 NY3d 915 [2008]), "While the effect of illegally initiated police intrusion may potentially become attenuated, as a practical matter there is rarely opportunity for the attenuation of primary official illegality in the context of brief, rapidly unfolding street or roadside encounters predicated on

less than probable cause . . . [O]nce a wrongful police-initiated intrusion is established, suppression of closely after-acquired evidence appears to follow ineluctably."

The attempt to cite force against a police officer as an independent basis for arrest, on the theory that any such use of force is unjustified under Penal Law § 35.27, has been rejected. Where the physical response is "immediate, spontaneous and proportionate" to the unlawful police conduct, the unlawful detention is not attenuated (*Felton*, 78 NY2d at 1065). Whether defendant might be able to claim that he was justified in pushing past the officers or whether such defense is barred by section 35.27 is not before us on appeal, nor is it material. As the Court of Appeals has stated, "although the statute might preclude a justification defense to a charge of assault, it could not serve to transform the illegal arrest of defendant into a lawful one" (*id.*).

Finally, although the subsequent recovery of contraband from defendant established that Porras was correct in his hunch that defendant was in possession of illegal drugs, the propriety of a search is determined at its inception, not by its proceeds (*see Wong Sun v United States*, 371 US 471, 484 [1963]; *People v Sobotker*, 43 NY2d 559, 565 [1978]). That illegal drugs were recovered from defendant is merely fortuitous.

If the tactics employed by the police against defendant are countenanced, any person might be approached, detained, intimidated, harassed, even provoked into a display of aggression and thereupon arrested, effectively eviscerating Fourth Amendment protections and "abandon[ing] the law-abiding citizen to the police officer's whim or caprice" (*Cantor*, 36 NY2d at 112). The Fourth Amendment serves to strike a balance between police power and individual freedom; it should not be dismissed as a hindrance to prosecution, to be dispensed with by resort to facile reasoning in the interest of sustaining a conviction.

Accordingly, the order should be affirmed.