[861 NYS2d 276]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v RASHAN MAY, Respondent.

First Department, May 27, 2008

## APPEARANCES OF COUNSEL

*Robert M. Morgenthau, District Attorney,* New York City (*Christopher P. Marinelli* and *Julie Paltrowitz* of counsel), for appellant.

*Law Offices of Don Savatta,* New York City (*Don Savatta* and *Germana F. Giordano* of counsel), for respondent.

## OPINION OF THE COURT

Saxe, J.P.

Where police officers who initially detained defendant on a routine traffic stop continued to detain him when no further identifiable grounds for the stop remained, defendant's suppression motion was properly granted.

On the night of June 21, 2006, Police Officer Brian Erbis was driving a marked police car on patrol in Manhattan's Chelsea neighborhood with Sergeant Pelicotti and Lieutenant Ryan. At approximately 9:45 P.M., Officer Erbis saw a Chevrolet Impala parked in a no standing zone in front of 501 West 28th Street. Erbis drove past the car and turned left onto 10th Avenue, while continuing to watch it. He then saw an African-American male exit a building and enter the driver's side of the car, after which the car drove east on 28th Street. Erbis followed behind, believing the car's occupants were involved in "some sort of drug activity."

The Impala turned south onto Seventh Avenue and double-parked in front of a delicatessen at the corner of 27th Street. The driver, defendant Rashan May, exited the car and went inside the deli, while his passenger, Robert Patterson, remained in the front passenger seat. Officer Erbis pulled behind the Impala and activated the police car's emergency lights. Carrying flashlights, all three officers approached the Impala. Sergeant Pelicotti stood behind the front passenger door, where he could see inside the car, Lieutenant Ryan stood behind the car, and Erbis approached the driver's side. All the car's windows were

rolled down. At this point, Erbis suspected that "other things were going on."

Erbis quickly scanned the car's interior, looking for weapons, then bent down, looked through the driver's window and asked Patterson where he was coming from. Patterson initially replied "[U]ptown," and then stated that he and defendant had just come from West 28th Street, where they were trying to locate a woman named Lindsey. Patterson's demeanor was calm and friendly.

Erbis first testified that when he asked Patterson to tell him Lindsey's apartment number, Patterson said he did not know. However, Erbis later testified that when asked this question, Patterson replied that Lindsey lived in apartment 1E. When confronted by the court about this discrepancy, Erbis maintained that when asked, Patterson did not know Lindsey's apartment number. However, the People's voluntary disclosure form states that Patterson told Erbis that Lindsey lived in apartment 1E. Erbis then asked for and took possession of Patterson's Alabama driver's license.

When defendant exited the deli, Erbis told him that he was double-parked and asked where he'd come from, to which defendant replied, "West 28th Street." Defendant provided Erbis with his license and the car's registration, which Erbis took back to the patrol car. Before doing so, though, Erbis asked defendant if there was anything in the car that he should know about, to which he received a negative response. Erbis then radioed the dispatcher to perform a license/registration/warrant check. He explained:

> "[I]t was very busy that night, so the dispatcher took the information and was processing it. And I remember it taking a while before the dispatcher came back to me with a response. Later on, a dispatcher said it was, quote, just no hit. I didn't feel comfortable with that kind of response because usually the dispatcher relays all kinds of information in regards. So, just on a professional hunch, I called for an available sector to come that has a computer."

The sector car arrived 10 to 15 minutes later. Erbis ran a background check on its computer and learned that there was an outstanding warrant for defendant on a DWI charge. At this point, it was about 10:30 P.M., 40 minutes after the initial stop and 25 to 30 minutes after Erbis had taken possession of defendant's driver's license and registration.

Upon learning of the warrant, Erbis instructed defendant to step out of the car. Defendant opened the car door, activating the interior lights, at which time, Erbis testified, he saw two small containers the size of prescription medicine bottles, two inches high and $1\frac{1}{2}$ inches in diameter, with white caps, containing a green leafy substance, on the floorboard behind the passenger seat. Erbis had previously seen this type of vial used to package hydroponic marijuana. Erbis then searched the car, recovering a plastic bag filled with additional vials of marijuana, which he also found on the rear floorboard. More vials were found in the center console, along with cash and business cards that Erbis believed were for a drug courier business. Defendant and Patterson were arrested and transported to the precinct, where searches conducted incident to arrest revealed cocaine in their possession.

The suppression court, while it accepted the bulk of Erbis's testimony, discredited his testimony that the two small vials of marijuana were in plain view when the door was opened. Rather, it found, based upon the size of the vials and the photographs depicting their location and visibility in the car, that the officer could not have seen the containers, and certainly could not have seen them well enough to observe that they contained marijuana. It held that because the search of the car was illegal, the marijuana seized as a result thereof should be suppressed, and that because the cocaine found on defendant's person was discovered due solely to an arrest made after an unlawful detention, it too must be suppressed.

Discussion

The People do not challenge the court's credibility finding and its consequent suppression of the marijuana. Their contention on appeal is limited to challenging the suppression of the cocaine found on defendant's person following his arrest. They argue that defendant's continued detention after the initial stop was not unreasonable in either scope, duration or intensity, and that the length of the detention was necessary and proper because the officer's initial check with authorities produced information that was lacking in reliability, requiring the officer to probe further.

To begin, the officers' initial approach of the Impala, their request for limited information and documents, and their detention of the vehicle for purposes of calling in a computer check and drawing up a summons were proper based upon the traffic violation (*see People v Valerio*, 274 AD2d 950 [2000], *affd* 95

NY2d 924 [2000], *cert denied* 532 US 981 [2001]). However, a traffic stop constitutes a limited seizure of a vehicle's occupants (*People v Banks*, 85 NY2d 558, 562 [1995], *cert denied* 516 US 868 [1995]; *People v Barreras*, 253 AD2d 369, 372 [1998]), and the length of any subsequent detention must be reasonably related to the circumstances which first justified the stop (*United States v Sharpe*, 470 US 675, 682 [1985]; *Banks* at 562; *Barreras* at 372-373).

In *Banks*, the Court of Appeals reversed a denial of the defendant's suppression motion where the defendant's car was pulled over on the Thruway for a seat belt violation, and thereafter detained while the Trooper who stopped it called for backup to search the vehicle. The Court held that the defendant's nervousness and the innocuous discrepancies between the driver's and the passenger's answers regarding the origin, destination and timing of their trip did not provide a basis for reasonable suspicion of criminality (85 NY2d at 562). In *Barreras*, this Court reversed the denial of the defendant's suppression motion, where the defendant's car had been pulled over for going through a stop sign, and although his papers were in order, the officer, suspecting further illegality but unable to supply an objective reasonable foundation for his suspicion, continued his questioning and then asked for permission to search the car. We held that "[o]nce defendant's papers were all found to be in order, the officers, without more, were obligated to issue the stop-sign summons and allow defendant to resume his journey, i.e., 'the initial justification for seizing and detaining defendant . . . was exhausted' " (253 AD2d at 373).

We reject the People's contention that notwithstanding the dispatcher's negative report, the police were entitled to detain defendant for such a protracted period based on nothing more than the belief that the dispatcher might not have performed a thorough and complete license and registration check.

In general, to detain an individual, the police must have a reasonable suspicion that criminal activity is either occurring or imminent (*People v May*, 81 NY2d 725, 727 [1992]; *People v Sobotker*, 43 NY2d 559, 563-564 [1978]). The Court of Appeals has held that for such a reasonable suspicion, "[t]he requisite knowledge must be more than subjective; it should have at least some demonstrable roots. Mere 'hunch' or 'gut reaction' will not do" (*Sobotker* at 564; *see People v Ingle*, 36 NY2d 413, 418-419 [1975]; *People v Elam*, 179 AD2d 229 [1992], *appeal dismissed* 80 NY2d 958 [1992]).

Here, defendant's protracted detention was not based upon reasonable suspicion, but rather was based purely upon the officer's "professional hunch." Neither defendant nor Patterson had behaved suspiciously when answering the officer's questions, and any minor discrepancies in Patterson's account of where they were traveling from "did not alone, as a matter of law, provide a basis for reasonable suspicion of criminality" (*People v Banks*, 85 NY2d at 562). The dispatcher's response, "[N]o hit," may have been unusually or unsatisfactorily brief to the officer, but it cannot establish the type of reasonable suspicion necessary to further detain defendant once his documents were found to be in order and the time needed to draw up a summons had passed.

The People also argue that the information the officers ultimately received of the open bench warrant "purge[d] any taint" caused by the unlawful detention. Such a use of hindsight to justify police actions has already been roundly criticized and flatly rejected. As the Court of Appeals explained in *People v Sobotker*:

> "Subsequent events did indeed demonstrate that the officers' hunch may well have been correct. But a search may not be justified by its avails alone. Constitutionally protected rights are not to be dispensed with . . . solely because the results of the improper . . . seizure uncovered the fact that one or all of the persons who were its targets were [subject to criminal charges]. Almost any series of indiscriminate seizures is bound to produce some instances of criminality that might otherwise have gone undetected or unprevented. But were hindsight alone to furnish the governing criteria, a vital constitutional safeguard of our personal security would soon be gone" (43 NY2d at 565; *see also Wong Sun v United States*, 371 US 471, 484 [1963] ["a search unlawful at its inception may (not) be validated by what it turns up"]).

The attenuation cases relied upon by the People have no applicability to these circumstances.

Since defendant's continued and protracted detention was unlawful, his arrest pursuant thereto was improper, and the contraband seized from his person as a result was properly suppressed by the motion court.

Accordingly, the orders of the Supreme Court, New York County (Marcy L. Kahn, J.), entered January 19, 2007 and Feb-

ruary 15, 2007, which, to the extent appealed from as limited by the brief, respectively granted defendant's motion to suppress cocaine recovered from his person and dismissed the first two counts of the indictment, should be affirmed.

SWEENY, McGUIRE and ACOSTA, JJ., concur.

Orders, Supreme Court, New York County, entered January 19, 2007 and February 15, 2007, affirmed.