OPINION OF THE COURT
James E. d’Auguste, J.
Plaintiff Walter Vargas and defendant City of New York move and cross-move, respectively, for summary judgment. For the reasons set forth herein, Vargas’ motion is denied and the City’s cross motion is granted.
Factual and Procedural Background
The undisputed facts, as relevant to this motion, are as follows: On September 21, 2010, Vargas was stopped by New York City Police Department (NYPD) Officers Brian Buith and Gur-vinde Singh (collectively, the officers) for a transit offense. The officers directly observed Vargas pass between two cars on a moving subway train in violation of 21 NYCRR 1050.9 (d), an offense punishable by “criminal prosecution in the criminal court of the City of New York” and up to 10 days in jail (21 NYCRR 1050.10 [a]). The officers immediately approached Vargas, informed him that he was not permitted to walk through the end doors of a subway car to change cars, asked for his identification, to which he responded by producing a valid New York State driver’s license on the train, and ordered him to get off the subway at the next stop. The officers then escorted Vargas to the mezzanine area of the subway station. Officer Singh remained with Vargas while Officer Buith went up to the street level to make a phone call to his precinct in order to determine if he had any active warrants or was a transit recidivist via a single record check, pursuant to an NYPD policy contained in a Transit Bureau Roll Call Training Memo dated December 16, 2009 (the policy). (See Porter aff, exhibit 7.)
Upon calling his base, Officer Buith received a 10-18 response, which meant, as indicated in the policy, discussed infra, that Vargas either had an open warrant or was a transit recidivist because he had previously been convicted of a transit-related offense. Vargas was then handcuffed and arrested, during which time the officers observed him drop a marijuana cigarette to the ground and step on it. Officer Buith then *526 searched Vargas’ person. Approximately six minutes elapsed from the time the officers observed Vargas illegally walk through subway cars on the moving train until the time he was handcuffed. Vargas was charged with unsafe riding in restricted areas within the Transit Authority (Rules of Metropolitan Transit Authority [21 NYCRR] § 1050.9 [d]), criminal possession of marijuana (Penal Law § 221.10 [1]) and tampering with physical evidence (Penal Law § 215.40 [2]). Vargas was arraigned on September 22, 2010 at New York City Criminal Court. On April 13, 2011, Vargas pleaded guilty to disorderly conduct in violation of Penal Law § 240.20, was sentenced to four days of community service, and paid a $120 mandatory surcharge.
The policy states that “all persons stopped for [transit offense] violations will be the subject of a ‘10-75W’ name check via radio. Arrests of rule violators will be predicated on any of the following factors, resulting in a 10-18 response by the Communications Division.” (Porter aff, exhibit 7 [emphasis omitted].) The policy provides that individuals who commit a transit offense are subject to formal arrest if they have an active warrant or they are classified as a transit recidivist (a 10-18 response).[1] (Id.) A “transit recidivist” was defined by the policy in force at the time of Vargas’ arrest as an individual who: (1) received five or more transit offenses (TABs)[2] within a 24-month period, (2) had any prior arrest for any offense in the transit system, (3) had any prior felony arrest in New York City, or (4) had an active warrant. (Porter aff, exhibit 7.)[3] Further, the policy stated that “[t]he absence of a predicate factor does not prohibit the arrest of an individual who cannot be issued a TAB/NOV due to a lack of identification or the failure to *527 verify the same.” (Porter aff, exhibit 7.)[4] Based upon the policy, any individual who committed a TAB violation, violated the NYCRR, or committed fare evasion with an aggravating factor[5] must be arrested, but could be given a desk appearance ticket (DAT), if eligible. (Porter aff, exhibit 7.) The only individuals to whom NYPD officers were required to give a summons were individuals committing fare evasion.[6]
On December 1, 2011, Vargas commenced this action against the City and Officers Buith and Singh.[7] In the first amended complaint, Vargas alleged the facts above and further claimed, inter alia, that “the police practice, in response to minor subway infractions, of moving subway passengers beyond the platform and extending the duration of detention beyond that which is reasonably necessary to issue a warning or summons after passengers provide a valid form of identification, is unconstitutional.” (Rayner aff, exhibit B, ¶ 34.) Vargas alleged that by wrongfully detaining him “for a minor subway infraction” in order to check his criminal record, and subsequently arresting him, the City violated article I, § 12 of the New York State Constitution.
Vargas now moves for (1) an order, pursuant to CPLR 3212, seeking summary judgment; (2) an order, pursuant to CPLR 3001 and 3014, for a declaration that the following NYPD policies and practices violate article I, § 12 of the State Constitution: (a) moving a subway passenger who has committed a transit offense beyond the subway platform and extending the limited stop beyond the time necessary to issue a ticket or warning, after valid identification is produced; (b) extending the duration and scope of a limited stop of a transit offender, after valid identification is produced, for the purpose of conducting an investigation of the passenger’s transit ticket *528 and arrest history; and (c) requiring a full custodial arrest of subway passengers who commit transit offenses based solely on the passenger having transit ticket or arrest history that falls within the NYPD’s criteria for designation as a “transit recidivist”; (3) an award of damages that will fully compensate him for his loss of constitutional rights, as well as the humiliation, embarrassment, and emotional distress suffered due to the City’s alleged unlawful policy and practice in an amount to be determined at trial; and (4) an award of reasonable attorneys’ fees, costs, and expenses incurred in prosecuting this action. The City cross-moves for an order, pursuant to CPLR 3212, seeking summary judgment dismissing all claims pleaded in the amended complaint.
Discussion
Although Vargas contends that his rights under article I, § 12 of the State Constitution were violated when the City, through the actions of its officers, arrested him, the officers’ actions complied in all respects with the State Constitution. The court’s analysis follows.
I. Probable Cause
The officers had probable cause to arrest Vargas.[8] Criminal Procedure Law § 140.10 (1) (a) provides the authority for a police officer to arrest an individual without a warrant for “[a]ny offense when he or she has reasonable cause to believe that such person has committed such offense in his or her presence.” The term “reasonable cause” has been equated with “probable cause.” (People v Lombardi, 18 AD2d 177, 180 [2d Dept 1963], aff'd 13 NY2d 1014 [1963].)[9] Here, Officers Buith and Singh directly observed Vargas pass between two cars of a moving subway train in violation of 21 NYCRR 1050.9 (d), which states, in pertinent part, that “[n]o person may use the *529 end doors of a subway car to pass from one subway car to another except in an emergency or when directed to do so by an authority conductor or a New York City police officer.” In this instance, there was no ongoing emergency at the time that Vargas passed through the subway cars, nor was he directed to pass through the cars by a police officer or any transit authority conductor. Notably, both state and federal courts that have examined the issue have uniformly held that officers who observe an individual violating 21 NYCRR 1050.9 (d) have both authority and probable cause to arrest said person.[10] Accordingly, Officers Buith and Singh had probable cause to arrest Vargas when they personally viewed him committing a transit offense in violation of 21 NYCRR 1050.9 (d).
II. Permissibility of Running a Record Check
Vargas’ argument that his rights under the State Constitution were violated when the officers extended the stop of a subway passenger for a violation of 21 NYCRR 1050.9 (d) in order to investigate the potential existence of outstanding warrants as well as his arrest history after having provided them with valid identification is without merit. Vargas asserts his *530 constitutional rights were violated because (1) the officers did not initially arrest him, they unlawfully extended his detention to conduct an unnecessary record check, pursuant to the policy, and, thereafter, (2) arrested him based upon the results of the record check. Vargas’ contention that the officers were not justified in detaining him to run a record check on his license “absent a reason to believe criminal activity was afoot” (plaintiff’s mem at 10) has no valid basis. As discussed, supra, the officers had reason to believe that unlawful behavior had occurred because they saw Vargas engage in unlawful conduct, which gave them probable cause to arrest him. Even though Vargas contends that he was not under arrest until he was handcuffed, this is simply incorrect based upon the legal definition of an arrest: “The law is settled that an arrest occurs when an individual is not at liberty to walk away.” (People v Ruiz, 136 AD2d 493, 496 [1st Dept 1988]; see also People v Jones, 172 AD2d 265, 266 [1st Dept 1991] [“An arrest is determined under an objective test of what a reasonable man, innocent of a crime, would have thought had he been in defendant’s position”].) Thus, “[e]ven without a technical formal arrest, a suspect’s detention may in fact be the equivalent of an arrest, requiring probable cause.” (People v Hicks, 68 NY2d 234, 239 [1986].) Vargas was under arrest since he was not free to leave once the officers ordered him off the train, asked for his identification, and escorted him into the plaza up until the point in time that he was placed in handcuffs. Following this line of reasoning, Vargas’ claims fail because the resulting detention to run a background check was placed on someone already under arrest based upon probable cause. (See e.g. Ruiz, 136 AD2d at 496; People v Jones, 38 Misc 2d 125, 128 [Monroe County Ct 1963] [“The continued questioning and the holding of the defendant amounted to an arrest”]; see also n 16, infra.)
Even if Vargas was not under arrest until he was formally handcuffed, his claim that the policy, to the extent it requires the detention of an individual to run a record check, still fails. New York courts have held that even where “the actions of the police officer fell short of the level of intrusion constituting an arrest [because] defendant was not placed in restraint[s] or told he was under arrest,” the police officer’s “observance of the [suspected criminal activity] gave [rise] to a reasonable suspicion that defendant had committed a crime which would justify the initial stop and detention.” (Jones, 172 AD2d at 266-267.) Further, the Court of Appeals has held that “judicial *531 review of the legality of police conduct must weigh the interference such conduct entails against the precipitating and attendant conditions known to the police as the encounter unfolds.” (People v Leung, 68 NY2d 734, 736 [1986], citing People v De Bour, 40 NY2d 210, 223 [1976]; People v Stewart, 41 NY2d 65 [1976].) In People v De Bour, the Court of Appeals “set forth a synopsis, representing the gradation of permissible police authority in encounters with citizens in public places, that correlated the degree of the officer’s objectively credible belief with the permissible scope of his intervention.” (Leung, 68 NY2d at 736, citing De Bour, 40 NY2d at 223.) The gradation, as it pertains to the within case, states that
“[t]he minimal intrusion of approaching to request information is permissible when there is some objective credible reason for that interference not necessarily indicative of criminality. The next degree, the common-law right to inquire, is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure. Where a police officer entertains a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor, the CPL [at section 140.50 (1)] authorizes a forcible stop and detention of that person.” (De Bour, 40 NY2d at 223 [citations omitted].)
According to De Bour, the greatest level of intrusion is a full custodial arrest when a police officer has probable cause to believe that a person has violated the law or committed a crime in his presence. (Id.) Here, despite the fact that a full custodial arrest occurred, the officers had the requisite level of suspicion required at all times during their interaction with Vargas, in accordance with De Bour.
Since limited state law exists on the constitutionality of stopping and arresting an individual for a transit offense, the Court of Appeals has held that “because the search and seizure language of the Fourth Amendment and of article I, § 12 is identical, they generally confer similar rights.” (People v Robinson, 97 NY2d 341, 350 [2001].) While the Court of Appeals “has not hesitated to expand the rights of New York citizens beyond those required by the Federal Constitution when a longstanding New York interest was involved” (id.), it has never *532 expanded such rights “when there was probable cause to conclude that a law or regulation has been violated” {id. at 351), as here. Accordingly, the application of case law analyzing one’s Fourth Amendment rights is appropriate herein.
Though not a perfect analogy, some courts have used traffic stop cases to analyze arrests for a “minor transit violation.” (Richardson v Providence, 2012 WL 1155775, *3, 2012 US Dist LEXIS 49068, *10 [ED NY, Apr. 6, 2012, No. 09-CV-4647 (ARR)(LB)] [“(T)he existence of probable cause to arrest—which the court found in its prior opinion—permitted defendants to execute a full arrest even for plaintiff’s minor transit violation”], citing Atwater v Lago Vista, 532 US 318, 354 [2001] [stating that a police officer may execute a full custodial arrest for a traffic violation, even a non-jailable offense, if there is probable cause that the individual committed even a minor crime].)[11] As will be discussed below, such an analogy with respect to 21 NYCRR 1050.9 (d) is imperfect since traffic violations carry a maximum penalty of a fine and are not jailable offenses,[12] while transit offenses under 21 NYCRR 1050.9 (d) are offenses punishable by potential incarceration. For example, Vargas relied on People v Banks (85 NY2d 558 [1995]), discussed infra, in which the driver was stopped for seat belt violations, and the police officer had written tickets for the traffic infractions and deliberately delayed the conclusion of the stop beyond the justification for and purpose of the officer’s mission. (See 85 NY2d at 560-561.) The situation in Banks is not analogous to the instant case because Vargas was stopped *533 for a jailable offense. The difficulty that courts confronted in determining the limits of the scope of police detention is that the initial traffic stop was made for non-jailable conduct that escalated into an arrest. In this situation, as discussed above, there was probable cause to arrest Vargas at the outset because the unlawful conduct at issue was originally a jailable offense committed in the officers’ presence. Thus, this is unlike a traffic stop where courts have struggled with sometimes differing outcomes and the fairness of arresting someone for conduct that, if proved, only mandated a fine.
Nonetheless, using the traffic stop analysis, the stop of Vargas was reasonable. Richardson v Providence (2012 WL 1155775, *3-4, 2012 US Dist LEXIS 49068, *10-11 [ED NY, Apr. 6, 2012, No. 09-CV-4647 (ARR)(LB)]), for instance, evaluates the period of detention for a transit violation based upon its reasonableness. Applying federal law, “the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure’s ‘mission’—to address the traffic violation that warranted the stop, and attend to related safety concerns.” (Rodriguez v United States, 575 US —, —, 135 S Ct 1609, 1614 [2015], citing Illinois v Caballes, 543 US 405, 407 [2005].) Thus, it follows that a traffic stop is only permitted to last as long as necessary to address the traffic violation and that “[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.” {Id.) The Second Circuit has held that
“[w]hen a traffic stop is supported by probable cause, the occupants of the car have no ‘right to be released the instant the steps to check license, registration, and outstanding warrants, and to write a ticket, had been completed . . . . [T]he fourth amendment does not require the release of a person arrested on probable cause at the earliest moment that step can be accomplished. What the Constitution requires is that the entire process remain reasonable.’ ” (United States v Harrison, 606 F3d 42, 45 [2d Cir 2010] [alterations in original], quoting United States v Childs, 277 F3d 947, 953-954 [7th Cir 2002 en banc]; see also Rodriguez, 575 US at —, 135 S Ct at 1615 [stating that in such a stop, the officer’s mission includes inquiries such as “checking the driver’s license, determining whether there are outstanding warrants against the driver, and inspecting the automobile’s registra *534 tion and proof of insurance”].)
As such, courts have held that “Monger [time] intervals than five to six minutes [between the stop and the arrest] have been deemed tolerable.” (Id. [citing cases that hold detentions of 14 and 17 minutes are not unconstitutional]; see also Esgro v Serkiz, 2007 WL 203957, *2, 2007 US Dist LEXIS 5026, *8-9 [ND NY, Jan. 24, 2007, No. 3:06-cv-0365] [finding that 20 to 30 minutes “between the initial stop and (p)laintiffs arrest” did not detain plaintiff “any longer than reasonably necessary for (the officer) to complete his investigation of the traffic violations and issue the several traffic citations”; citing cases that permit a traffic stop to last as long as necessary to issue traffic citations, including running a computer check].)
Further, “[a]n officer’s inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.” (Arizona v Johnson, 555 US 323, 333 [2009]; but see Richardson, 2012 WL 1155775, *3, 2012 US Dist LEXIS 49068, *8 [holding that detaining an arrested individual in a subway station “for an hour and a half out of ill will or for delay’s sake” while the officers were talking and joking with one another was unconstitutional].) “Moreover, ‘[a] traffic stop may be extended for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts.’ ” (United States v Gomez, 199 F Supp 3d 728, 742 [SD NY, July 29, 2016], quoting United States v Foreste, 780 F3d 518, 523 [2d Cir 2015].)
In applying the traffic stop analysis, courts have held that it is permissible for police officers to direct the driver to exit the car during a stop after having been pulled over. (People v Pena, 209 AD2d 744, 745 [3d Dept 1994], citing New York v Class, 475 US 106, 115 [1986]; People v Carter, 199 AD2d 817 [3d Dept 1993].) The driver was then obligated to produce identification and the car’s registration upon the officer’s request. (See id. at 744-745.) The driver’s inability to prove that he was the owner of the car, or who owned the car for that matter, permitted the officers to detain the car and its occupants to run a radio check to determine the existence of any criminal activity, such as whether the car had been stolen. (Id. at 745-746.) While there was a delay in making the radio call due to conversation that the officer had with the defendant, the court held that “[t]he record does not establish that the Troopers purposefully *535 delayed making a radio call in order to detain the car and its occupants in the hope that they could use the additional time to uncover facts suggestive of criminality,” and was not improper. {Id. at 746 [“(W)e find nothing improper in the police conduct leading up to the search”].) In evaluating whether an individual was unreasonably delayed, courts have held that “[e]xamples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay’s sake.” (Richardson, 2012 WL 1155775, *3, 2012 US Dist LEXIS 49068, *8.)
While this court recognizes that the situation at issue in this case involving mass transit is unlike being pulled over by a police officer for a traffic stop, the best argument that Vargas has is to analogize the situation to a traffic stop that may have unnecessarily escalated, as discussed above in Richardson. However, situations in subways involving transit offenses have different variables to take into account. Here, the officers removed Vargas from a subway train and ran a name check on his license, an event that has occurred in other cases discussed herein. The reality is that, in the context of a traffic stop, officers pull drivers over and run a license check as a routine matter. Despite Vargas’ disagreement and challenge to the policy, it is a uniform public policy that is necessary to prevent any disparity in treatment for individuals who have committed unlawful conduct. As such, there is nothing unconstitutional about the policy as long as it is not premised upon any discriminatory motive.
Here, Officers Buith and Singh saw Vargas commit a transit offense, which provided them with probable cause for his arrest. Until the point in time when the officers witnessed Vargas drop a marijuana cigarette and attempt to destroy evidence, a separate crime, the officers’ actions were confined to the original “mission” of stopping and arresting him—namely, investigating the observed unlawful conduct. The officers asked Vargas for identification, an action within their authority. Officer Buith then called his precinct to run a record check on Vargas’ name to determine whether there were any open warrants for his arrest or if he was a transit recidivist, which has been upheld in the context of traffic stops as constitutional and within the scope of the officers’ mission. (See e.g. Rodriguez, 575 US at —, 135 S Ct at 1614.) Vargas was detained for five to six minutes from the time the officers witnessed him com *536 mitting a transit offense until the time he was handcuffed. Vargas’ limited detention was reasonably related to the officers’ original mission and purpose that initially justified the stop— that he was seen committing unlawful conduct. (See People v May, 52 AD3d 147, 150-151 [1st Dept 2008].)[13]
Vargas’ reliance on People v Banks (85 NY2d 558 [1995]), for the proposition that “continuing an involuntary detention of a motorist . . . without reason to believe there was criminal activity occurring, was unlawful” (plaintiff’s mem at 10-11), while true, does not take into account the specific factual scenario in that case. In Banks, the Court held that the officer’s observation of a traffic violation “justified the initial stop,” once “[the officer’s] license and stolen vehicle radio check came back negative and he prepared the traffic tickets for the seat belt violations, the initial justification for seizing and detaining defendant and [his passenger] was exhausted.” (85 NY2d at 562.) The Court found that any police action after the radio check was improper, not that the radio check itself constituted an involuntary detention that was not reasonably related in scope to the initial traffic stop. (See id.) Further, Vargas’ reliance “is misplaced because, in [Banks], the driver of the vehicle had been detained after he was issued traffic tickets.” (People v Rainey, 49 AD3d 1337, 1339 [4th Dept 2008].) Additionally, even if the radio check could be construed as a “warrantless search conducted during an investigative detention,” it was “ ‘reasonably related in scope to the circumstances which justified it initially.’ ” (United States v Walker, 922 F Supp 724, 729 [ND NY 1996], quoting United States v Montoya de Hernandez, 473 US 531, 542 [1985] [declining to follow Banks].) Accordingly, Banks is not applicable to the instant case.
Moreover, Vargas’ reliance on United States v Bernacet (724 F3d 269 [2d Cir 2013]), for arguing that a record check is a violation of his constitutional rights is misplaced. The relevant facts in Bernacet are as follows: Bernacet pulled up to a traffic checkpoint and, as a driver, his license was collected by an NYPD officer who ran his driver’s license through NYPD’s “FINEST” system in the squad car that “ ‘generate [d] a report from the New York Statewide Police Information Network *537 (‘NYSPIN’), which includes data from multiple sources, including’ Federal Bureau of Investigation (‘FBI’) databases, New York State law enforcement records, and New York Department of Motor Vehicle (‘DMV’) records.” (724 F3d at 271 [alteration in original].) Bernacet challenged “the use of a criminal history database search at a routine traffic checkpoint [as it] rendered the stop an unconstitutional seizure of his person,” and his resulting arrest due to the NYSPIN search indicating he was in violation of his parole. (Id.) The court held that “(1) the criminal history database search was a de minimis extension of the constitutional traffic checkpoint; (2) the police had probable cause to believe that Bernacet was violating his parole; and (3) Bernacet’s arrest was constitutional.” (Id.) As a result, the court held “that the NYSPIN search was reasonable.” (Id. at 272.) The Bernacet Court specifically states that “Bernacet does not challenge the legality of the traffic stop itself, and he does not argue that the search of law enforcement databases unconstitutionally infringed his privacy interests.” (Id.) The court, in Bernacet, specifically construes his constitutional challenge as one related to the alleged “law enforcement database search during an otherwise constitutional traffic stop, which ‘effectuate[d] a seizure within the meaning of the Fourth Amendment.’ ” (Id. at 272 n 1 [alteration in original], quoting City of Indianapolis v Edmond, 531 US 32, 40 [2000].) The Second Circuit explicitly states the following regarding Bernacet’s constitutional challenge of the use of drivers’ licenses to search law enforcement databases:
“Insofar as he intends to challenge the use of the NYSPIN database as a search, and not because it prolonged the seizure, this claim is devoid of merit. ‘[T]he government’s matching of a lawfully obtained identification record against other records in its lawful possession does not infringe on an individual’s legitimate expectation of privacy.’ Boroian v Mueller, 616 F3d 60, 67 (1st Cir. 2010) (collecting cases). Police officers are permitted to look up anyone’s parole status at any time; the only intrusion into privacy interests here was the requirement that motorists wait while the police did so.”

(Id.)

While the plaintiff in Bernacet makes a similar argument as Vargas does here, “that the NYPD’s search of law enforcement databases at a traffic stop was constitutionally unreasonable because it was not closely related to the purpose of the *538 checkpoint,” the court found the intrusion to be de minimis and thus constitutional. (Id. at 273.) Accordingly, the record check performed by Officer Buith was also constitutional.[14] The NYPD’s query of its own computer records and databases is not a search of a person or a person’s property subject to constitutional protections, and, as such, is not a search incident to arrest.[15] This can be seen when comparing the facts surrounding Vargas’ arrest to the search incident to arrest that was conducted in People v Febres (118 AD3d 489, 490 [1st Dept 2014]), wherein a plastic bag that was put on the ground by the defendant prior to his arrest was searched despite the fact that there was no indication that the defendant might attempt *539 to access the bag. The Febres Court found that “given the nature of the transit violations, there was no possibility that the bag could contain evidence to support those charges,” and suppressed evidence found from the search of the defendant’s bag that was unrelated to any transit offenses he committed. (Id.) As such, Vargas’ argument that mischaracterizes the NYPD’s record check as an improper search incident to arrest is without merit.
Additionally, Vargas’ reliance on People v Robinson (97 NY2d 341, 353 [2001]), for the proposition that “any search made by the police subsequent to that stop, remain[s] subject to the strictures of article I, § 12, and judicial review” ignores that the Court’s holding “addresses only the initial police action upon which the vehicular stop was predicated” and nothing more, such as the “scope, duration and intensity of the seizure, as well as any search made by the police subsequent to that stop.” Again, Vargas’ reliance on this case similarly ignores the factual context of the case. In Robinson, the Court was presented with the argument that the stops were pretextual and held that “[t]he alternatives to upholding a stop based solely upon reasonable cause to believe a traffic infraction has been committed put unacceptable restraints on law enforcement.” (Id.) The Robinson Court found that this was true “whether those restrictions are based upon the primary motivation of an officer or upon what a reasonable traffic police officer would have done in the circumstances” and further held that “[r]ather than restrain the police in these instances, the police should be permitted to do what they are sworn to do—uphold the law.” (Id.)
Furthermore, the Supreme Court of the United States “recognized that in contrast to random, suspicionless searches, the decision to stop a vehicle is reasonable where the police have probable cause to believe that a traffic infraction has occurred.” (Id. at 354, citing Delaware v Prouse, 440 US 648, 659 [1979].) Moreover, because the Vehicle and Traffic Law, similar to the policy, “provides an objective grid upon which to measure probable cause, a stop based on that standard is not arbitrary in the context of constitutional search and seizure jurisprudence.” (Id. at 355.) Accordingly, “probable cause stops are not based on the discretion of police officers. They are based on violations of law.” (Id.) The Court of Appeals elaborates that, in the traffic stop context, “[a]n officer may choose to stop someone for a ‘minor’ violation after considering a number of *540 factors, including traffic and weather conditions, but the officer’s authority to stop a vehicle is circumscribed by the requirement of a violation of a duly enacted law.” (Id.) Most importantly, “ [i]n other words, it is the violation of a statute that both triggers the officer’s authority to make the stop and limits the officer’s discretion.” (Id. [emphasis added].) The Court of Appeals agreed with the Supreme Court in Whren v United States (517 US 806 [1996]), which “unanimously held that where a police officer has probable cause to detain a person temporarily for a traffic violation, that seizure does not violate the Fourth Amendment to the United States Constitution even though the underlying reason for the stop might have been to investigate some other matter.” (Robinson, 97 NY2d at 348.) In agreement with Whren, the Court of Appeals held that limiting a police officer’s authority to make a stop “would unduly restrict police from enforcing laws that the Legislature has seen fit to impose on individuals.” (Id. at 356.)
Additionally, the result of the record check constitutes evidence that cannot be suppressed as any sort of alleged illegal search incident to Vargas’ arrest as it consists of information that would be independently obtained from the discovery of his identity. (See e.g. Tolentino, 14 NY3d at 385-386 [holding that even where an arrest may be illegal, if that arrest “only leads to (the) discovery of the man’s identity and that merely leads to the official file or other independent evidence,” the evidence obtained from such a record check cannot be suppressed as they are records already in the possession of authorities], quoting United States v Guzman-Bruno, 27 F3d 420, 422 [9th Cir 1994], citing United States v Crews, 445 US 463, 475-477, 475 n 22 [1980]; Matter of Jason W., 272 AD2d 214 [1st Dept 2000]; People v Bargas, 101 AD2d 751, 752 [1st Dept 1984].) While Vargas claims that his arrest, based solely upon the results of the record check, is unconstitutional, courts have upheld arrests where the probable cause is based upon information obtained from a record check. (People v Currie, 131 AD3d 1265, 1265 [2d Dept 2015] [“(T)he police had probable cause to arrest the defendant upon learning from a computer check that there was an open warrant for his arrest”]; People v Davis, 277 AD2d 462, 463 [2d Dept 2000] [having observed suspicious activity, police officers ran a computer check, which “provided the police officers with probable cause to arrest the defendant”]; People v Alston, 189 AD2d 555 [1st Dept 1993] [having run a computer check on a suspected stolen credit card that indicated the card *541 was stolen the previous day created probable cause to arrest defendant]; People v Francis, 12 Misc 3d 781, 784 [Sup Ct, NY County 2006, Carro, J.] [having stopped a vehicle for violating the Vehicle and Traffic Law and running a computer check on the operator’s driver’s license, which revealed that the operator was driving with a suspended license, formed probable cause for his arrest].) Thus, Vargas’ argument that the officers could not run a record check, including one for outstanding warrants, is without merit. (See plaintiff’s mem at 14 [“Absent an articulable reason for the officers to believe Mr. Vargas had a warrant, there was no justification for a warrant check”].)
While Vargas attempts to rely on People v Reid (24 NY3d 615 [2014]), and People v Mangurn (125 AD3d 401 [1st Dept 2015]), for the proposition that he would not have been arrested except for the name check search performed by Officer Buith, since the officers had not yet formed the intent to arrest him, this argument misconstrues the holdings of the above cases.[16] Instead, both Reid and Mangurn stand for the proposition that a physical search incident to an individual’s arrest cannot serve the basis for said individual’s arrest. Reid and Mangurn have nothing to do with record checks. However, taking this argument to its absolute extreme, which Vargas attempts to do, it would be unreasonable to say that a police officer could not run a record check on an individual’s driver’s license to investigate the possible existence of an open arrest warrant. As stated above, the Constitution does not prohibit the police from running a record check on an individual who is being detained for unlawful conduct. If the officers conducted any action that could possibly be construed as a search, any such search would have been based on the unlawful conduct viewed by the officers, which was related in scope to Vargas’ initial stop.
*542 III. Vargas Had No Right to a DAT
Despite conceding the existence of probable cause, Vargas contends that his constitutional rights were violated when he was unnecessarily detained by the officers in order to run a record check, which indicated that he was a transit recidivist and resulted in his arrest, rather than the issuance of a DAT. Contrary to the underlying premise of this argument—that record checks, including checks for outstanding warrants, are irrelevant in the transit context—determining whether an individual who committed unlawful behavior has outstanding warrants, or is a transit recidivist, serves a valuable public safety purpose. Performing such a record check prior to deciding whether to arrest an individual, in lieu of issuing a DAT, is entirely reasonable. (See May, 52 AD3d at 149-150 [approving of “(the officers’) request for limited information and documents, and their detention of the vehicle for purposes of calling in a computer check (including a warrant check) and drawing up a summons (as) proper based upon the traffic violation” that the officers viewed the defendant commit].)[17]
In Febres, “[t]he police detained [Febres] in a subway station for violating Transit Authority regulations. Because a warrant check revealed that [he] had an active warrant, the police decided to arrest him rather than issue a summons.” (118 AD3d at 489.) The Court specifically indicated that the plaintiff in Febres was “arrested for minor nonviolent offenses and was not suspected of any crimes,” but “he was handcuffed and guarded by several officers,” despite being “fully cooperative” and nonthreatening. (Id. at 490.) Accordingly, the fact that Vargas had a valid New York State driver’s license is only one factor to take into account in determining whether to issue him a DAT or to arrest him; it is not dispositive of whether the officers were required to issue him a DAT. In conjunction with viewing the unlawful conduct, the officers made additional inquiries, including running a computer check on his name to determine whether he had any open warrants or had previously committed any criminal offense specified in the policy.
*543 Additionally, although Vargas contends that the officers should have issued him a ticket in lieu of arresting him, this court (Brigantti, J.), in the same context, found that his argument lacked merit. (Murphy, 2015 NY Slip Op 32744[U], *7 [“Plaintiff contends that since she was never actually charged with a crime, issued a summons or desk appearance ticket, or sent to central booking, there was no basis to make the arrest. However, as noted above, it is not disputed that (p)laintiff was observed walking between the subway cars before she was arrested”].) In Murphy, the plaintiff argued that the City’s motion for summary judgment “must be denied because the officer should have, ... at most, issued [p]laintiff a summons.” (Id.) Further, the plaintiff in that case argued “that the officer’s understanding that Plaintiff was a ‘transit recidivist’ was erroneous, and the officer ultimately conceded that he did not ‘run her name’ before the arrest and did not know what [p]laintiff did to prevent him from offering a ticket.” (Id.) Yet, this ignores the fact that the police officer who arrested the plaintiff testified that after he saw her pass through cars on a moving subway train, he placed her under arrest for violating a “transit code” and transported her to the local precinct. (Id. at *1.) As articulated by the Murphy court:
“[plaintiff’s] arguments, however, are unavailing, because ‘a police officer’s authority to effect a custodial arrest for a violation, other than a minor vehicular offense (see People v. Marsh, 20 N.Y.2d 98, 228 N.E.2d 783 [1967]), remains valid even where the officer has the option of issuing a summons instead’ (People v. Rodriguez, 84 A.D.3d 500, 501 [1st Dept. 2011], citing People v. Lewis, 50 A.D.3d 595 [1st Dept. 2008], Iv. den., 11 N.Y.3d 790 [2008]).” (Id. at *7; see also Banushi v City of New York, 2010 WL 4065414, *2-3, *9, 2010 US Dist LEXIS 109903, *9, *27 [ED NY, Oct. 15, 2010, No. 08-CV-2937 (KAM)(JO)] [having arrested an individual for fare evasion, one of the arresting officers testified that “officers determine on a ‘case by case’ basis whether to arrest or issue a Desk Appearance ticket for transit offenses”]; Bryant v City of New York, 404 F3d 128, 132-135 [2d Cir 2005] [affirming dismissal of plaintiffs’ violation of due process claims for being subjected to a full custodial arrest instead of being issued a DAT on the grounds that (1) “an arrestee is not entitled to a DAT as a mat *544 ter of right” and (2) denial of a DAT, under New York law, “did not reach the level of a federal constitutional violation because the decision did not shock the conscience”].)
Accordingly, Vargas’ argument that he should have been issued a ticket in lieu of being arrested is without merit.
Further, Vargas’ reliance on People v Barreras (253 AD2d 369 [1st Dept 1998]) is also misplaced. Vargas relies on Bar-reras for the proposition that “[o]nce defendant’s papers were all found to be in order, the officers, without more, were obligated to issue the stop-sign summons and allow defendant to resume his journey, i.e., ‘the initial justification for seizing and detaining defendant . . . was exhausted’ ” (253 AD2d at 373 [second alteration in original and emphasis added], quoting Banks, 85 NY2d at 562). First, Vargas ignores that a stop sign violation is a non-jailable offense. Second, Vargas ignores that, in this instance, the officers had additional qualifying circumstances for which to arrest him instead of issuing him a DAT— namely that running a computer check on his name indicated that he was a transit recidivist. Accordingly, Barreras is not applicable to the instant case.
IV Safety
Furthermore, beyond making the determination of whether simply to issue a traffic ticket or arrest an individual, checking one’s driver’s license and determining whether any outstanding warrants exist against said individual in the traffic context serve the same dual safety purposes of the policy: to protect the safety of the individual who is the subject of the violation and to protect the safety of the public at large. (Rodriguez, 575 US at —, 135 S Ct at 1615.) This is true despite Vargas’ contention that verification of his license does not relate to subway safety concerns.
Similar to a traffic stop, stopping an individual who committed a transit offense protects not only the safety of the individual stopped, but also the safety of the other passengers on the subway, as applicable in this context. Officer Buith testified that the transit offense committed by Vargas, walking between the cars of a moving subway train, “could endanger the safety of the individual if he falls through the train car” and such person could be “struck by the train and killed,” which would also endanger other subway passengers. (Porter aff, exhibit 3, tr at 81, line 19 through 82, line 2.) Additionally, Vargas’ actions could potentially endanger other subway passengers *545 because, as Officer Buith testified, “it has been known that people walking through train car doors attempt robberies, pickpocket, and scout out different locations within the subway-cars [for] the opportunity to commit a crime.” (Id.) By running a name check on an individual stopped for a transit offense, the police are able to determine whether the person previously committed the same unlawful conduct, which may lead an officer to conclude that such a person may commit additional future transit offenses, or whether that person has an outstanding warrant for any crime, which improves public safety by taking an individual charged with committing a criminal offense into custody. Accordingly, “[t]hese checks serve the same objective as enforcement of the traffic code,” ensuring safe and responsible conduct by individuals riding the subway. (Rodriguez, 575 US at —, 135 S Ct at 1615; see also Prouse, 440 US at 658-659; 4 Wayne R. LaFave, Search and Seizure § 9.3 [c] at 516 [5th ed 2012] [“(A) warrant check makes it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses”].) In fact, “[t]he NYPD Transit recidivist database’ was established ‘[i]n an effort to identify persons likely to commit crimes in the transit system or persons who routinely violate transit rules and disregard notices to appear at the Transit Adjudication Bureau.’ ” (Cancel, 167 F Supp 3d at 588 n 4 [second and third alterations in original and citation omitted].) Citing New York City public policy, the court in Cancel noted that “[a] person stopped for a violation of transit rules who is identified as a transit recidivist is ineligible for a civil notice and must be arrested for the offense.” (Id. [citation omitted].)
The public safety aspect of the policy is also reflected by the fact that it contains guidelines that require the arrest of an individual with any prior felony arrest in New York City, including an offense such as a “weapons arrest within NYC in the last four years.” (Id. [citation omitted].) Additionally, as stated by the Court of Appeals in Robinson, “regulating the ability of the police to stop a vehicle when there is probable cause to believe that a traffic regulation has been violated does little to expand the rights of the accused” and “[i]nstead it may lead to the harm of innocent citizens.” (97 NY2d at 351.) While Vargas’ concern in this case, as in Robinson, is that police officers will use their power to stop persons on a selective and arbitrary basis. However, the guidelines in the policy for determining when to arrest an individual versus issuing a DAT protect the *546 public at large because the requirement to arrest an individual is premised upon the existence of an aggravating factor that may endanger other individuals nearby, especially where the officer only receives a coded response from a record check and does not know what the specific aggravating factor is. (See Robinson, 97 NY2d at 355.) Ultimately, Vargas essentially concedes that the police can arrest everyone who violates 21 NYCRR 1050.9 (d), including himself (plaintiff’s mem at 20), and, accordingly his argument that a policy resulting in less people being arrested for transit offenses not only fails to demonstrate a constitutional impediment, but is not logically sound.
Conclusion
Based upon the foregoing, Vargas’ motion is denied in its entirety and the City’s motion for summary judgment is granted. Accordingly, the action is dismissed.

. Regarding a 10-18 response, the policy reads as follows: “ARREST re: transit recidivist or warrant.” (Id.)

. TAB specifically stands for the New York City Transit Adjudication Bureau, “which adjudicate [s] transit violations for New York City’s public transit system.” (New York Civ. Liberties Union v New York City Tr. Auth., 675 F Supp 2d 411, 412 [SD NY 2009].)

. The policy was then amended, effective January 20, 2012, solely to revise the definition of a “transit recidivist” to mean an individual: (1) with any prior index crime, sex crime, or weapon possession arrest within New York City in the previous four years; (2) with any prior felony or misdemeanor arrest in the transit system within the previous two years; (3) with three or more violation arrests in the transit system within the previous five years; (4) with three or more unanswered TAB summonses; or (5) on parole or probation. (Id. exhibit 8.) The seven major crimes in the index crime category are murder, rape, robbery, felony assault, burglary, grand larceny, and grand larceny of a motor vehicle. (Defendant’s mem in opp at 6 n 2.)

. An “NOV” is a “Notice of Violation and Hearing” that is provided to a person charged with violating the New York City Transit Authority’s Rules of Conduct, which are set forth at 21 NYCRR 1050 et seq., and is provided to an individual prior to a TAB hearing. (New York Civ. Liberties Union, 675 F Supp 2d at 413, 416.)

. Pursuant to the policy, aggravating factors include (1) use of a police MetroCard reported lost or stolen, (2) use of an NYC transit employee Metro-Card reported lost or stolen, or (3) a Department of Education employee using a student MetroCard. (Id.)

. Fare evasion consists of the unauthorized use of a police or NYC transit employee MetroCard not reported lost or stolen. (Id.)

. This action was dismissed against Officers Buith and Singh for lack of personal jurisdiction by the decision and order of this court (Freed, J.) (motion sequence No. 002), dated and entered on March 13, 2014.

. Vargas appears to dispute the existence of probable cause to stop and arrest him (plaintiff’s mem at 8-23), but then concedes its existence (id. at 8, 20). Given the apparently conflicting assertions, the court has conducted a probable cause analysis.

. People v Graham, 211 AD2d 55, 58 (1st Dept 1995) (“Probable cause is defined as the body of information available to a police officer ‘which would lead a reasonable person who possesses the same expertise as the officer to conclude, under the circumstances, that a crime is being or was committed’ ”), quoting People v McRay, 51 NY2d 594, 602 (1980); see People v Howard, 200 AD2d 538, 539 (1st Dept 1994) (stating that probable cause existed for the defendant’s arrest where the arresting officer’s partner saw the defendant commit the crime and the arresting officer saw the defendant flee from the scene).

. See e.g. United States v Miles, 748 F3d 485, 490 (2d Cir 2014) (“NYPD officers had the authority to arrest [the defendant] when he passed from one car to another through the end doors. A plain reading of [21 NYCRR 1050.9 (d)] resolves the matter. Accordingly, the district court correctly held that there was probable cause to arrest and frisk [the defendant]” [citation omitted]); Chevalier v City of New York, 2011 WL 4831197, *2, 2011 US Dist LEXIS 117862, *4 (SD NY, Oct. 12, 2011, No. 11 Civ 1511[LBS][GWG]) (holding that probable cause existed to arrest the defendant who did “not dispute that he walked between subway cars in violation of 21 NYCRR § 1050.9 [d] or that he was observed doing so”); Hernandez v City of New York, 2004 WL 2624675, *6 and n 4, 2004 US Dist LEXIS 23365, *19 and n 4 (SD NY, Nov. 18, 2004, No. 00 Civ 9507[RWS]) (holding that probable cause to arrest for a violation of 21 NYCRR 1050.9 [d] where the defendant “has admitted [1] that he passed between subway cars while the train was in motion on the night in question, and [2] that [the arresting officers] observed him while he engaged in this conduct. These admissions provide uncontested proof that [the arresting officers] had probable cause to arrest him” [citation omitted]); Murphy v City of New York, 2015 NY Slip Op 32744[U], *6 (Sup Ct, Bronx County, Dec. 16, 2015, No. 21195/2014) (“Here, it is not disputed that Plaintiff walked between the subway cars in violation of 2[1] NYCRR § 1050.9 [d], and that Officer Millington observed her doing so . . . . Officer Millington, therefore, had probable cause to arrest Plaintiff”); Skeene v City of New York, 2016 WL 927182, *2, 2016 US Dist LEXIS 29160, *5 (ED NY, Mar. 7, 2016, 14-cv-6054 [ENV] [CLP]) (stating that “there can be no legitimate dispute that probable cause supported [the defendant’s] arrest—it is pleaded in the complaint. [The defendant] acknowledges that he was seen walking between subway cars while the train was being held at the station” and finding that the defendant was guilty of violating 21 NYCRR 1050.9 [d]).

. It is arguable that New York could adopt the minority approach in At-water, which distinguishes between jailable and fine-only offenses. (532 US at 360-368 [5-4 decision, O’Connor, J., dissenting] [“If the State has decided that a fine, and not imprisonment, is the appropriate punishment for an offense, the State’s interest in taking a person suspected of committing that offense into custody is surely limited, at best”].) This is because, as recognized by the Court of Appeals in People v Marsh (20 NY2d 98, 102 [1967]), the legislature never intended for individuals who commit traffic infractions to be treated “as a common criminal to be booked, photographed, fingerprinted and jailed.” While not relevant to this decision, as Vargas was arrested for a jailable offense, even the minority opinion would permit, upon “ ‘specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the additional] intrusion’ of a full custodial arrest.” (Atwater, 532 US at 366 [5-4 decision, O’Connor, J., dissenting] [alteration in original], quoting Terry v Ohio, 392 US 1, 21 [1968].)

. Section 1229-c (5) of the Vehicle and Traffic Law states that the penalties for violating the provisions of this section are “punished by a civil fine of up to fifty dollars” or “a civil fine of not less than twenty-five nor more than one hundred dollars.”

. While the prolonged detention for a second warrant check in May was ultimately found to be unreasonable, had the initial warrant check, which was supported by something more than merely the officer’s professional hunch, discovered the DWI warrant, May suggests that the outcome of the case would have been different.

. This proposition is similarly supported by both Murphy and United States v Cancel (167 F Supp 3d 584 [SD NY 2016]). In Murphy, after the police officer viewed the plaintiff commit a violation of 21 NYCRR 1050.9 (d), the officer asked her to get off the train at the next subway stop. (2015 NY Slip Op 32744[U], *1.) At that subway station, the police officer requested Murphy’s identification, which she produced to the officer. (Id.) Murphy testified that the police officer ran two record checks and “she heard the precinct come back on the radio and tell him that [she] had no warrants,” however, this does not conclusively negate the possibility that there was another existing factor that resulted in the determination that she was a transit recidivist. (Id.) All of this activity occurred prior to Murphy being placed in handcuffs. (Id.) Nonetheless, the court upheld the plaintiff’s arrest, and the case was ultimately dismissed. (Id. at *7-8.)
Similarly, the procedure for investigating transit offenses leading up to a full custodial arrest, as contained in the policy and contested by plaintiff in the instant motion, was not contested in United States v Cancel (167 F Supp 3d 584 [SD NY 2016]). In Cancel, the police officers viewed Cancel committing fare evasion, a transit offense pursuant to the policy, by attempting to enter the subway through the emergency gate. (Id. at 587.) The police officers, after questioning Cancel, walked him over to a bench and sat him down. (Id.) At this point, the police officers had not yet handcuffed Cancel. (Id. at 588.) At the request of one of the police officers, “Cancel produced his identification card.” (Id.) That same officer “then called his precinct and asked [an officer] to ‘run’ Cancel’s name.” (Id.) That officer “entered Cancel’s name and date of birth into a database called ‘Host On-Demand,’ which reports ‘whether the person has a warrant, [is a] [t]ransit recidivist or anything like that.’ ” (Id. [alterations in original and citation omitted].) The officer “examined Cancel’s rap sheet by ‘running the NYSID,’ or ‘New York State Identification Number.’ ” (Id. [citation omitted].) “From this records check, [the officer] determined that Cancel was a transit recidivist, and told [the officer who called in] to ‘bring [Cancel] in.’ ” (Id. [last alteration in original and footnote and citation omitted].) The officer that was sitting with Cancel “testified that he ‘understood that to mean that [he was] going to have to place [Cancel] under arrest.’ ” (Id. [first alteration in original and citation omitted].) At that point Cancel was handcuffed. (Id.)

. See People v Tolentino, 14 NY3d 382, 385-386 (2010) (stating that DMV records do not constitute a search incident to arrest because the records do not belong to the individual being detained).

. It is interesting that Vargas relies on both Robinson and Reid, since Reid distinguishes Robinson: Reid specifically states that Robinson stands for the proposition that “a stop or arrest is valid where it is supported by the necessary level of suspicion or probable cause, whatever the actual motive for the officer’s action.” (Reid, 24 NY3d at 619-620.) However, even if a search incident to arrest were to have occurred in this instance with respect to the record check, Reid would support such a search regardless of whether Vargas had been under arrest at the time of the record check. (Id. at 620 [“(T)he ‘search incident to arrest’ doctrine, by its nature, requires proof that, at the time of the search, an arrest has already occurred or is about to occur. Where no arrest has yet taken place, the officer must have intended to make one if the ‘search incident’ exception is to be applied”].)

. Vargas’ argument that the warrant check in May revealed an outstanding DWI charge, “which may be understood to be related to the mission of a traffic stop” (plaintiff’s mem at 14 n 9), puts the cart before the horse. As the City correctly argues, the police officers in May would not have known whether the warrant check would reveal any open warrants, and thus discovering an open warrant for a DWI offense was not related to the purpose of the police officers’ original traffic stop. (See defendant’s mem in opp at 19 n 4.)